Opinion by Judge O’SCANNLAIN; Concurrence by Judge BERZON; Dissent by Judge KLEINFELD.
OPINION
O’SCANNLAIN, Circuit Judge:
We must decide whether the United States may be sued under the Federal *1107 Tort Claims Act for the actions of the National Park Service relating to a mountain goat that attacked and killed a Park visitor.
I
A
Established in 1938, Olympic National Park (“Olympic” or the “Park”) spans 922,-650 acres and hosts three million visitors each year. Among the many species of animal residing in Olympic is the mountain goat, which is not native to the area, having been introduced into the Park decades ago. Mountain goats possess dangerously sharp horns, and males typically weigh around 242 pounds. Prior to the incident in this case, there had been three reported, non-lethal attacks on people by mountain goats at other national parks, none of which were known to officials at Olympic.
Normally, mountain goats are reclusive animals, but the goats at Olympic frequently seek out areas visited by humans because of the salt humans leave behind. After repeated exposure to humans, goats can become habituated to their presence, which entails the loss of the mountain goat’s fear response. Around 2004, when the goat population at Olympic was near 300, officials at the Park began receiving reports that some goats were becoming habituated; by 2006, goats began displaying aggressive behavior, such as standing their ground, following or chasing humans, pawing the ground, and rearing up.
Park officials decided to investigate the situation personally. They hiked the trails and observed the mountain goats demonstrating progressively habituated and sometimes aggressive behavior. Officials placed collars on the goats with Global Positioning System devices in order to track their movements and to collect further data.
Based on these observations, the Park began warning visitors about the goats’ behavior. Visitors were given verbal warnings, and warning signs were posted on trails. Officials began employing aversive conditioning 'techniques, such as shooting the goats with paint balls and bean-bags, in order to change the goats’ behavior. Officials focused their efforts on a few areas, including Klahhane Ridge.
Nonetheless, officials continued to receive reports in 2009 and 2010 about a large male goat chasing visitors and displaying other signs of aggression. Officials began discussing other management options for the problematic goat, but, as stated by Park Ranger Sanny Lustig, the solution “was not clear-cut.” Sometime before July 30, 2010, Olympic Superintendent Karen Gustin, Wildlife Branch Chief Dr. Patti Happe, and Ranger Lustig met to discuss management options for the goat. They coordinated their reporting and hazing efforts and decided to intensify the aversive conditioning. Dr. Happe was to. investigate the possibility of relocating the goat. On July 30, she emailed Washington State Department of Fish and Wildlife biologist Dr. Donny Martorello to ask whether they “had an option for translocation.” She described the goat and stated that it was “not responding to [their] efforts to have him keep ... a greater distance from people.” Dr. Happe wrote that, because the goat had been “increasingly aggressive,” Olympic wished to “explore other management options for [the goat], including relocation from the area.”
Over the next two months, there were continued reports of goats pawing the ground, preventing hikers from passing, and acting aggressively. On October 16, 2010, Robert Boardman and his wife, Susan Chadd, were hiking on the Switchback trail to Klahhane Ridge with a friend, Pat *1108 Willits, when a large male goat attacked Boardman, goring his leg with its horns and severing his femoral artery. Board-man died of his wound. Park officials found and destroyed a 370-pound male goat with blood on its horns within hours of the attack.
' B
, Chadd, on her own behalf and as representative of Boardman’s estate, filed suit against the United States and the National Park Service (the “Service”) under the Federal Tort Claims Act (FTCA), alleging that Park officials breached their duty of reasonable care by failing to destroy the goat in the years leading up to Boardman’s death.[1] The government moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, simultaneously filing declarations and other evidence in support of the motion. The parties proceeded with discovery.
On August 20, 2012, the district court granted the government’s motion to dismiss.[2] Chadd timely appealed.
II
As a sovereign, the United States is immune from suit unless it waives such immunity. FDIC v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The United States has waived its sovereign immunity with regard to tort liability under the Federal Tort Claims Act “under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.” 28 U.S.C. § 1346(b)(1). “The Act did not waive the sovereign immunity of the United States in all respects, however; Congress was careful to except from the Act’s broad waiver of immunity several important classes of tort claims.” United States v. S.A Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Among these is the discretionary function exception contained in 28 U.S.C. § 2680(a). Id.
The discretionary function exception retains the United States’s sovereign immunity for “[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.” 28 U.S.C. § 2680(a). This exception “marks the boundary between Congress’ willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.” Varig, 467 U.S. at 808, 104 S.Ct. 2755. It is designed to “prevent judicial ‘second-guessing’ of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.” Id. at 814, 104 S.Ct. 2755. The government bears the burden of proving that the discretionary function exception applies. Bailey v. United States, 623 F.3d 855, 859 (9th Cir.2010).
The Supreme Court has established a two-step process for evaluating *1109 whether a claim falls within the discretionary function exception. First, a court examines whether the government’s actions are “discretionary in nature, acts that in-volv[e] an element of judgment or choice.” United States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (internal quotation marks omitted). In making this examination, it is “the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.” Varig, 467 U.S. at 813, 104 S.Ct. 2755. “If there is ... a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee has no rightful option but to adhere to the directive.” Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir.2008) (internal quotation marks omitted).
Second, “even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield.” Gaubert, 499 U.S. at 322-23, 111 S.Ct. 1267 (internal quotation marks omitted). “The exception protects only government actions and decisions based on social, economic, and political policy.” Miller v. United States, 163 F.3d 591, 593 (9th Cir.1998) (internal quotation marks omitted). However, the exception “is not confined to the policy or planning level” and extends to “the actions of Gov-emment agents.” Gaubert, 499 U.S. at 325, 323, 111 S.Ct. 1267.
It is also important to bear in mind that the decision giving rise to tort liability “need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis.” Miller, 163 F.3d at 593. Thus, “if a regulation allows the [governmental] employee discretion,” there is “a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.” Gaubert, 499 U.S. at 324, 111 S.Ct. 1267. In such cases, the plaintiff “must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.” Id. at 324-25, 111 S.Ct. 1267. In any event, “[t]he focus of the inquiry is not on the agent’s subjective intent in exercising the discretion conferred by statute or regulation, but on the. nature of the actions taken and on whether they are susceptible to policy analysis.” Id. at 325, 111 S.Ct. 1267.[3]
Ill
A
Chadd’s tort suit alleges that the Service should have destroyed the goat before it killed Boardman, and that the Service’s failure to do so constituted negligence.[4] The first issue, then, is whether *1110 “a statute or policy directing mandatory and specific action” required the Service to destroy the goat before it attacked Board-man. Terbush, 516 F.3d at 1129. If none did, then the Service’s management of the goat necessarily “involv[ed] an element of judgment or choice,” and the first prong of the discretionary function exception is satisfied. Gaubert, 499 U.S. at 322, 111 S.Ct. 1267 (internal quotation marks omitted).
The Service’s Management Policies manual (the “manual”) is “the basic Service-wide policy document of the National Park Service” and is “mandatory unless specifically waived or modified by the Secretary, the Assistant Secretary, or the Director.” The government does not dispute that this manual governed the Service’s actions in the lead-up to Boardman’s death. Section 8.2.5.1 of the Management Policies manual instructs, “The saving of human life will take precedence over all other management actions....” However, the manual qualifies this obligation in the following manner: “The Service will do this within the constraints of the 1916 Organic Act. The primary — and very substantial — constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.” Moreover, the obligation to “reduce or remove known hazards” is limited by what is “practicable and consistent with congressionally designated purposes and mandates.”
These statements indicate that there are many factors the Service must consider while ensuring human safety in the national parks, such as “park resources and values,” what is “practicable,” and “con-gressionally designated purposes and mandates.” Indeed, the manual explicitly provides, “[t]hese management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level.... ” Such discretion includes “whether to ... eliminate potentially dangerous animals.”
The manual also contains guidance specific to exotic (that is, non-native) species, such as the mountain goats at Olympic. It declares that such species “will be managed — up to and including eradication — if (1) control is prudent and feasible, and (2) the exotic species ... creates a hazard to public safety.” How exotic species are to be managed is not specified. The manual, then, imposes no particular, mandatory course of action for managing an exotic animal that is threatening public safety.
Nor does Olympic’s park-specific Nuisance and Hazardous Management Animal Plan. That document outlines various “management objectives” and “management alternatives,” but nowhere does it require Park officials to use a particular management technique when confronted with a dangerous, exotic species. In fact, the plan indicates that different species and contexts will require different management options, as when it notes, “For some species, such as black bears, a long history of management failures and successes exists.... For other species, such as cougars, few proven management techniques exist.” Chadd points to Superintendent Gustin’s statement that the Service “move[s] to the next level [of management techniques] or series of levels” if “the problem isn’t going away or doesn’t seem to be resolved,” but Gus-tin’s statement does not indicate that there is a general policy or directive re *1111 quiring such action or prescribing the timing of it. As it is, nothing in the plan mandates an escalation of management techniques.
Finally, Olympic’s Mountain Goat Action Plan lists three forms of hazing as appropriate incident management techniques, but it does not specify how or when they should be deployed. The Mountain Goat Action Plan does not even mention animal destruction, in contrast with the Cougar Action Plan. There was, therefore, no extant statute, regulation, or policy directive that required Park officials to destroy the goat prior to Boardman’s death.
Indeed, Chadd acknowledges as much. In her reply brief, Chadd states, “Contrary to the government’s principal argument, Chadd does not argue that there is a mandatory directive prescribing a specific course of conduct.” Instead, “Reasonable care, not a ‘mandatory directive,’ required [Park officials] to shoot the goat.” But whether reasonable care required such action goes to the merits of Chadd’s negligence claim, not to the question of whether Park officials had discretion in deciding how to manage the problematic goat. Chadd might very well be correct that Park officials abused their discretion in a tortious manner, but, at step one of the discretionary-function-exception analysis, all that matters is that there was, in fact, discretion. See Gaubert, 499 U.S. at 322, 111 S.Ct. 1267.
B
1
Chadd focuses her arguments almost exclusively on the second step of the discretionary function analysis. She begins by arguing that because the government is liable for a “garden-variety tort, not a high-level policy decision,” applying the discretionary tort exception would “contradict[] the sovereign-immunity waiver at the heart of the FTCA.” Gaubert, however, forecloses that argument. In Gaubert, the Supreme Court made clear that the exception “is not confined to the policy or planning level” and extends to “the actions of Government agents.” 499 U.S. at 325, 323, 111 S.Ct. 1267. It does not matter, then, if the decision at issue was made by low-level government officials, rather than by high-level policymakers. “[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.” Varig, 467 U.S. at 813, 104 S.Ct. 2755; see also Whisnant v. United States, 400 F.3d 1177, 1181 (9th Cir.2005) (stating that “the applicability of the exception does not depend on whether the relevant decision was made by an individual at the ‘operational’ or ‘planning’ level”).
2
Chadd also contends that Park officials “had only one choice: comply with their own policies requiring them to prioritize human life and kill the goat.” As discussed above, Chadd’s reply brief disclaims the argument that “there is a mandatory directive prescribing a specific course of conduct.” Instead, her argument that Park officials had '“only one choice” seems to be an echo of her claim that “Reasonable care, not a ‘mandatory directive,’ required [Park officials] to shoot the goat.” But whether there was only one reasonable course of action is not the relevant question for determining subject matter jurisdiction under § 2680(a). Rather, the question is whether the course of action chosen was “susceptible to a policy analysis,” Miller, 163 F.3d at 593 (emphasis added), even if the action constituted an abuse of policy discretion, see Bailey, 623 F.3d at 861 (noting that “the discretionary function exception provides immunity even to abuses of discretion”). With regard to the discretionary function exception, our analysis of subject matter jurisdiction is *1112 distinct from our analysis of the merits. Chadd’s argument conflates these separate inquiries and must be rejected.
3
Chadd’s principal argument relies on our decision in Whisnant, where we construed past precedent as holding that “the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not.” 400 F.3d at 1181 (emphasis omitted). This distinction between policy design and implementation is only relevant at the second step of the discretionary function analysis.
In Whisnant, the plaintiff delivered seafood products to a military commissary, causing him to come into contact with “toxic mold the government negligently allowed to colonize the commissary’s meat department over a period of three years.” Id. at 1179. This Court held that, although “[n]o statute, policy, or regulation prescribed the specific manner in which the commissary was to be inspected or a specific course of conduct for addressing mold,” the decision to remove the mold was not one protected by the discretionary function exception. Id. at 1181, 1183. As Whisnant stated, “Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy.” Id. at 1183. “Because removing an obvious health hazard is a matter of safety and not policy, the government’s alleged failure to control the accumulation of toxic mold ... cannot be protected under the discretionary function exception.” Id.
Chadd believes the same is true of her case. In her view, Olympic’s “failure to escalate up the levels of [the Nuisance and Hazardous Management Animal Plan]” was a failure to implement a safety measure, just as the failure to remove mold was in Whisnant. She points to the repeated acknowledgments by Park officials that the goat was dangerous and aggressive; the fact that the hazing techniques used by officials were known to have only a “temporary” effect; Gustin’s statement that the usual practice is to “ramp up” management techniques when one is not working; and the history of incidents surrounding mountain goats in Olympic. Chadd believes the goat was an “obvious health hazard” that was “a matter of safety and not policy.” Whisnant, 400 F.3d at 1183.
Although Whisnant drew the distinction between policy design and implementation, it also made clear that the “implementation of a government policy is shielded where the implementation itself implicates policy concerns, such as where government officials must, consider competing firefighter safety and public safety considerations in deciding how to fight a forest fire.” Id. at 1182 n. 3 (second emphasis added). Thus, this Court has subsequently stated that “so long as a decision involves even two competing [policy] interests, it is ‘susceptible’ to policy analysis and is thus protected by the discretionary function exception.” Bailey, 623 F.3d at 863 (emphasis added). What distinguished the mold situation in Whisnant is that there was no legitimate reason for the commissary not to eliminate the toxic mold.[5] But, at step two of the discretionary-function-exception analysis, where there is even one policy reason why officials may decide not to take a particular course of action to address a safety concern, the exception applies. Id.; see also Soldano v. United States, 453 F.3d 1140, *1113 1150 (9th Cir.2006) (holding that the discretionary function exception did not apply because there was “no reason” justifying the government’s failure to implement a safety measure); Alfrey v. United States, 276 F.3d 557, 565 (9th Cir.2002) (citing only two competing policy considerations in holding that the discretionary function exception applied); Miller, 163 F.3d at 595-96 (describing the competing policy considerations involved in deciding how to address multiple forest fires).
As the district court noted, park officials evaluated multiple policy considerations in deciding how to manage the problematic goat. Although the goat, as an exotic species, was not entitled to the same level of protection or consideration as native species at Olympic, the public desired to see the goats. Both Dr. Happe and Olympic Deputy Superintendent Todd Suess submitted declarations stating, “The mountain goat is an appealing, iconic animal within Olympic ... and is an attraction to park visitors. In the past, the park has encountered significant opposition to possible plans to remove some of the goats.” In light of the public’s interest in preserving Olympic’s goats, Park officials implemented several non-lethal management options, such as hazing, and explored the possibility of relocating the goat.
Chadd counters that preservation of the goats is contrary to their status as an exotic species and violates the Service’s policy of prioritizing human safety over all other considerations. But from the premise that the goats are not entitled to special protection as a matter of policy, it does not follow that Park officials ought to exterminate them. Native species in the Park have a default level of protection that mountain goats do not enjoy, but Chadd has pointed to nothing that forbids Park officials from protecting the goats to facilitate the public’s enjoyment of the species.[6] There is no contradiction between the goat’s status as an exotic species and Olympic’s desire to implement safety measures short of destruction.
As for the policy of prioritizing human safety, it is clear that the means by which local officials ensure human safety “is left to the discretion of superintendents and other decision-makers at the park level.” See supra Part III.A. Such discretion includes decisions about animal destruction. Moreover, the Service’s policy manual lists several competing objectives that Park officials had to consider in assessing the goat situation, including “park resources and values.”
Thus, in addition to the policy issues mentioned by Park officials, the Service’s guidelines cite many competing considerations that Olympic should have taken into account when deciding how to deal with the problematic goat. Whether Park officials actually took into consideration the policy objectives listed in the Service’s guidelines is irrelevant because the challenged decision “need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis.” Miller, 163 F.3d at 593 (emphases added). Indeed, “if a regulation allows the [governmental] employee discretion,” as it did here, there is “a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regula *1114 tions.” Gaubert, 499 U.S. at 324, 111 S.Ct. 1267. Park officials need only point to “some support in the record that the decisions taken [were] ‘susceptible’ to policy analysis for the discretionary function exception to apply,” and that standard is more than met here. Terbush, 516 F.3d at 1134. The holding of Whisnant is thus inapplicable, as the implementation of the safety regulation was itself subject to competing policy concerns. Bailey, 623 F.3d at 863. Because the decision to use nonlethal methods to manage the goat was susceptible to policy analysis, the discretionary function exception applies.
IV
The district court’s order dismissing this case for lack of subject matter jurisdiction is AFFIRMED.

. Jacob Haverfield, Boardman’s stepson, was initially a plaintiff in this case, but he later moved the district court for voluntary dismissal of his claims. For this reason, the district court’s order dismissing Chadd’s suit for lack of subject matter jurisdiction did not list Haverfield as a plaintiff. He is, therefore, not a parly to this appeal.

. In addition to her claim regarding the Park’s management of the goat in the lead-up to Boardman’s death, Chadd originally claimed that the Park’s response to the goat attack was deficient. The district court dismissed that claim in a separate order, which Chadd has not appealed.

. Thus, the dissent’s assertion that the discretionary function should be limited to an analysis of whether the government agent intended, subjectively, to exercise policy-based discretion, Dissent Op. at 1116, is incorrect.

. At oral argument, counsel for Chadd argued that the Park Service’s 2009 decision to begin intensive hazing of the mountain goat constituted a mandatory directive for purposes of the discretionary function exception and that the Service failed to implement its hazing policy properly. This argument was entirely-new, never having been raised in the district court or in Chadd’s opening brief. It is also a highly fact-dependent argument, which makes it difficult to evaluate without the benefit of district court findings and full briefing. We address “only issues which are argued specifically and distinctly in a party’s opening brief.” Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir.1994). Moreover, ”[i]t is well established that an appellate court will not reverse a district court on the basis of a theory that was not raised below.” Alaska Airlines, Inc. *1110 v. United Airlines, Inc., 948 F.2d 536, 546 n. 15 (9th Cir.1991). We therefore decline to consider Chadd’s argument relating to the Service’s implementation of its decision to haze the goat.

. The commissary cited budgetary concerns, but this Court has repeatedly held that budgetary considerations, standing alone, cannot form the basis for the application of the discretionary function exception. Whisnant, 400 F.3d at 1183-84; ARA Leisure. Servs. v. United States, 831 F.2d 193, 195-96 (9th Cir.1987).

. The officials' interest in facilitating the public's enjoyment of the Park’s wildlife also distinguishes this case from the “routine tort case” the dissent claims is analogous to this one — that of a homeowner and his dangerous dog. Whereas the homeowner can claim no Jegitimate interest in the public’s enjoyment of his dangerous pet, Park officials engaged in wildlife management must consider the public’s interest in enjoying the wildlife at the Park in its natural state.