**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANIEL KIM; GRACE KIM; HANNAH KIM, a minor through her guardian Grace Kim; FRANCIS S. LEE; VIVIAN LEE, *Plaintiffs-Appellants*, v. UNITED STATES OF AMERICA, *Defendant-Appellee.* | No. 17-17432 D.C. No. 1:16-cv-01656-LJO-SKO OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Chief District Judge, Presiding

Argued and Submitted February 13, 2019
San Francisco, California

Filed October 10, 2019

Before: Mary M. Schroeder, Diarmuid F. O'Scannlain,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by
Judge Rawlinson

# SUMMARY[*]

## Federal Tort Claims Act

The panel affirmed the district court's dismissal of the plaintiffs' claim for fraudulent concealment, and reversed the dismissal of the negligence-based claims, in a Federal Tort Claims Act ("FTCA") suit against federal officials for their failure to prevent the deaths of two boys who were killed when a tree limb fell onto their tent in Yosemite National Park.

The FTCA's discretionary function exception bars claims based upon the federal officials' "exercise or performance or the failure to exercise or perform a discretionary function or duty."  28 U.S.C. § 2680(a).

The plaintiff families first argued that the district court erred in finding their negligence-based causes of action to be barred by the discretionary function exception to the FTCA. The panel held that regardless of whether the discretionary function exception might apply to some hypothetical decision *not* to inspect the campground, the panel had to decide whether Park officials were shielded from liability for their conduct in actually inspecting that area once they undertook to do so.  The panel further held that once Park officials undertook to evaluate the danger of the trees in the campground, they were required to do so according to the technical criteria set forth in the Park's official policies. Yosemite Park Directive No. 25 set forth the Park's "Hazard

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Tree Management" program that specified how park officials were to evaluate the risk imposed by trees they inspected. An appendix to the directive detailed a Seven-Point system for rating tree dangers. The panel held that the officials in evaluating the tree under their Seven-Point system were not exempt from the scope of the FTCA.

The government contended that the even if it knew or should have known about the danger posed by the tree, the plaintiffs' negligence-based claims were still barred because Park officials had significant discretion regarding what to do in response to that danger. The panel held that as with the Park's duty to take some action to abate a high-risk tree, fulfilling the Park's duty to inform visitors somehow about that risk did not involve considerations of public policy. Accordingly, the discretionary function exception to the FTCA did not bar the plaintiffs' claim that the government negligently failed to give Park visitors any warning about the tree.

Plaintiffs argued that the district court erred in dismissing their claim that Park officials fraudulently concealed information about the dangers posed by the tree in "order to continue charging camping fees" to visitors. The district court found that this fraudulent concealment claim was barred by the FTCA's exception for claims "arising out of . . . misrepresentation [or] deceit." 28 U.S.C. § 2680(h). The panel held that the fraudulent concealment claim here was not one that involved misrepresentations only collaterally. The panel concluded that the district court did not err in dismissing the claim under the FTCA's misrepresentation exception.

Judge Rawlinson concurred in part and dissented in part. Judge Rawlinson agreed with the majority that the district

court properly dismissed the fraudulent concealment claim, but disagreed with the majority's conclusion that the district court erred in dismissing the negligence-based claims under the discretionary function exception to the FTCA. Judge Rawlinson wrote that the majority erred in concluding that the Hazard Tree Management program created a mandatory duty on the part of officials responsible for managing Yosemite National Park.

## COUNSEL

Martin N. Buchanan (argued), Law Office of Martin N. Buchanan APC, San Diego, California; Thomas V. Girardi and Kelly Winter, Girardi Keese, Los Angeles, California; for Plaintiff-Appellants.

Philip A. Scarborough (argued), Assistant United States Attorney; McGregor Scott, United States Attorney; United States Attorney's Office, Sacramento, California; for Defendant-Appellee.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Federal Tort Claims Act bars a suit against federal officials for their failure to prevent the deaths of two boys who were killed when a tree limb fell onto their tent in Yosemite National Park.

I

On August 14, 2015, Daniel and Grace Kim, their daughter Hannah, their teenaged son Dragon, and their son's friend Justin Lee were camping in Campsite 29 of the Upper Pines Campground in Yosemite National Park ("Yosemite" or the "Park"). Around 5:00 in the morning, a limb from a large oak tree overhanging the campsite broke and fell on the tent where the two boys were sleeping, killing them. The Kims and Justin Lee's parents (collectively, "the families") sued the United States under the Federal Tort Claims Act ("FTCA"), alleging that National Park Service ("NPS") officials were responsible for the accident.

The families' original complaint raised two negligence-based causes of action: wrongful death and negligent infliction of emotional distress. The complaint alleged that NPS officials knew or should have known of the danger posed by the tree, but negligently failed to abate that danger and to warn campers about it. The United States successfully moved to dismiss the complaint under the FTCA's discretionary function exception, which bars tort claims against the United States that are "based upon the [government's] exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a). After reviewing Yosemite's policies regarding tree maintenance, the district court found that decisions regarding "how to evaluate and respond to tree hazards" were subject to the discretion of Park officials. The court dismissed the complaint but "in an abundance of caution" granted the families leave to amend.

The families filed an amended complaint that repeated the two original causes of action and added a third: that Park officials knew and fraudulently concealed information about the danger posed by the tree so that campers would continue

to patronize the campground. The district court again dismissed the complaint. First, the court adopted its analysis from its previous order dismissing the original complaint and concluded that the two negligence-based causes of action remained barred by the discretionary function exception. Second, the court concluded that, although the new fraudulent-concealment claim was *not* barred by the discretionary function exception, it was barred by the FTCA's separate exception for "[a]ny claim arising out of . . . misrepresentation [or] deceit" by the government. 28 U.S.C. § 2680(h). The court did not afford the families an opportunity to amend the complaint a second time.

The families timely appealed, and they argue that the district court erred in dismissing each of their causes of action.

## II

The families first argue that the district court erred in finding their negligence-based causes of action to be barred by the discretionary function exception to the FTCA.

The FTCA generally authorizes private parties to sue the United States for the tortious conduct of federal officials, but the discretionary function exception bars suit under the FTCA for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The point of the exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988) (internal quotation marks omitted). The government bears the burden of

showing that the exception applies. *See Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008).

We evaluate the exception in two steps. First, "we must determine whether the challenged actions involve an element of judgment or choice." *Id.* at 1129 (internal quotation marks omitted). If "a statute or policy direct[s] mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee has no rightful option but to adhere to the directive." *Id.* (internal quotation marks omitted). Second, if the actions do involve an element of judgment, we must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield, namely, only governmental actions and decisions based on considerations of public policy." *Id.* (internal quotation marks omitted). The relevant choice must be susceptible to some consideration of "social, economic, [or] political policy." *Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015) (internal quotation marks omitted).

The actions relevant to the families' claims are (1) Park officials' alleged failure to identify the danger presented by the tree that collapsed and (2) their alleged failure to abate and to provide warnings about such danger. The families urge that such actions are not subject to policy-based discretion of the sort covered by the exception.

A

The government contends, and the district court found, that the families' claims fail at the outset because the discretionary function exception bars any claim based upon Park officials' alleged failure to discover a specific tree hazard in the Park. The government asserts that Park officials maintain significant discretion over how best to

inspect trees in Yosemite, and thus they cannot be held liable for failing to identify the danger posed by the tree in question.

1

The government first argues that Park officials exercised considerable discretion over even *whether* to inspect the tree in question for hazards. Applicable Park policies do not require any particular trees to be inspected but state only that surveys of trees should occur in developed areas of the Park "on a regular periodic basis." But we need not—and we do not—decide whether the government is right about the nature of its supposed discretion over which areas to inspect, because any such discretion is beside the point in this case. The government admits that in each of the two years prior to the accident the "the Upper Pines Campground was inspected and hundreds of hazard trees were identified and abated, [though] [t]hose inspections did not identify the subject tree as hazardous." Regardless of whether the discretionary function exception might apply to some hypothetical decision *not* to inspect the campground, here we must decide whether Park officials are shielded from liability for their conduct in actually inspecting that area once they undertook to do so. *See Myers v. United States*, 652 F.3d 1021, 1032–33 (9th Cir. 2011) (holding that once the choice to pursue a project is made the court "look[s] at the nature of the actions in *conducting* the . . . project, not the decision to undertake" it (emphasis added)).

2

The government next argues that, even when Park officials do inspect a tree, their determination of the extent of the hazard posed by such tree is shielded by the discretionary function exception.

Once they undertook to inspect trees in the campground, Park officials were required to do so in accordance with their established policies. *See id.* Yosemite Park Directive No. 25 sets forth the Park's "Hazard Tree Management" program and, among other things, it specifies how Park officials are to evaluate the risk posed by trees they inspect. Directive No. 25 states that Yosemite "implement[s] the 'Seven-Point' (Mills and Russel 1980) system, a professionally recognized, documented and quantified hazard tree rating system." An appendix to the directive details the Seven-Point system, under which each tree is assigned a "Total Hazard Rating" (ranging from two to seven) that combines a "Defect Rating" based on the tree's potential for physical failure and a "Target Rating" based on the potential impact in the event of a failure. The system provides specific criteria for how to rate each component based on the tree's visible features and the nature of the surrounding area. Trees with a total rating of five or higher are considered "high" risks and, according to directive, "will require some type of abatement/mitigation."

Park officials certainly had substantial discretion in choosing *whether* to adopt the Seven-Point system instead of some other method for evaluating trees. But that decision was made in Directive No. 25, which must now be followed.[1] Regardless of the policy considerations that went into the choice to adopt the system, the *implementation* of such system cannot be said to turn on those same considerations. *See Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) ("[W]e have generally held that the *design* of a course of governmental action is shielded by

---

[1] None of the dissent's many references to the general discretion otherwise granted to Park officials suggest that the officials were free to ignore Directive No. 25's explicit requirement to rate trees according to the Seven-Point system when inspecting them.

the discretionary function exception, whereas the *implementation* of that course of action is not."); *Marlys Bear Med. v. United States*, 241 F.3d 1208, 1215 (9th Cir. 2001) (same).

The government insists, however, that even its implementation of the rating system is shielded by the discretionary function exception because the system itself requires officials to consider questions of public policy. *See Whisnant*, 400 F.3d at 1182 n.3 ("The implementation of a government policy *is* shielded where the implementation itself implicates policy concerns . . . ."). The government appears to conflate *policy* considerations with *technical* considerations. "[M]atters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy." *Id.* at 1181; *see also Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1031 (9th Cir. 1989) ("[D]eciding whether to remove unsuitable materials during construction [of a canal] was based not on policy judgments but on technical, scientific, engineering considerations."). Yet scientific and professional judgment is all the Park's rating-system requires. The system directs officials to assign certain hazard ratings based on a tree's structural defects and its likelihood of damaging various Park features.[2] The only flexibility built into the rating system is to allow officials to modify the standards to "reflect variations in [tree] species

---

[2] The criteria for determining the Defect Rating relate to the nature of the tree's visible decay and damage, such as the presence of dead limbs, rot, or fungus. The criteria for the Target Rating are even "more standardized," and relate to the tree's proximity to features such as campgrounds, lodges, residences, trails, roads, and picnic areas.

and environmental factors"—i.e., to accommodate additional technical considerations.

Certainly, the system requires the careful—perhaps even difficult—application of specialized knowledge.  As the government points out, the parties have presented competing experts with opposing views as to what rating should have been assigned to the tree.  So the appropriate evaluation of a tree under the system is not free from debate.  But technicians, like anyone else, can disagree about their craft. The mere fact that experts might reach different conclusions when conducting a technical analysis does not mean that the analysis somehow turns on questions of public policy.  Even if the Seven-Point system requires officials to make difficult choices, it still does not ask them to make *policy* choices and it does not afford them an opportunity to rate a tree based on their social, economic, or political views.  Indeed, neither the government nor the dissent has identified even a single policy-based consideration that might influence the rating assigned to a tree.[3]

In sum, once Park officials undertook to evaluate the danger of the trees in the campground, they were required to do so according to the technical criteria set forth in the Park's official policies.  While it is unclear whether the families will succeed in showing that officials were actually negligent in evaluating the tree under the Seven-Point system, such evaluation is not exempt from the scope of the FTCA.  *Cf.*

---

[3] The dissent essentially ignores the requirement that, to be shielded by the discretionary function exception, the relevant government action must be subject to considerations of social, economic, or political policy. It argues that the hazard rating assigned to a tree is discretionary rather than mandatory, but it fails to explain how that rating is a choice rooted in *public policy* rather than in technical considerations of a tree's structural health and its likelihood of causing damage to nearby Park facilities. *See* Dissent at 27–28.

*Whisnant*, 400 F.3d at 1181–83 ("professional and scientific judgment" regarding how to remediate mold not protected by the exception); *Kennewick Irrigation Dist.*, 880 F.2d at 1031 (decision whether to remove hazardous materials from a construction site based on "sound engineering practices" not protected by the exception).

3

A final error undermines the district court's conclusion that the government cannot be sued for its failure to discover the danger presented by the tree: the families have separately alleged that Park officials *in fact knew* of such danger, because the tree had similarly broken in the past and had begun to bow noticeably above the campsite in question. Even if the district court were correct that the government could not be held liable for failing to discover the threat of the tree, that conclusion has no bearing if the government actually knew of the threat.

The government suggests that this question has already been answered in its favor. It asserts that the "only evidence concerning the Park's actual knowledge shows that it did not know the tree presented a hazard," citing records that indicate the tree in question was not selected for abatement during 2014 and 2015 surveys of the campground. In its order dismissing the first complaint, the district court similarly observed that the families "ha[d] not offered any evidence that Defendant in fact rated . . . the Subject Tree as a high or very high hazard." But, at this point in litigation, this should hardly be surprising. Although they were allowed to submit evidence addressing issues raised in the government's motion to dismiss, the parties have not yet conducted discovery. Indeed, the district court *denied* the families' request for limited discovery to unearth evidence regarding what Park officials knew about the tree.

At this stage, the court "must accept as true the factual allegations in the complaint," including the allegation that the government knew about the risks posed by the tree. *Terbush*, 516 F.3d at 1128. Curiously, in its order dismissing the second complaint, the district court appears to have assumed that (as alleged) the government knew about the danger posed by the tree. In fact, the court found that the families' fraudulent concealment was *not* barred by the discretionary function exception based largely on this assumption. The court found that the exception did not apply because, if the government knew of the danger, then its alleged decision to conceal such information from campers could not have been based in considerations of public policy. This same assumption should have applied with respect to the families' negligence-based claims, as well.[4]

B

Even if it knew or should have known about the danger posed by the tree, the government contends that the families' negligence-based claims are still barred because Park officials had significant discretion regarding what to do in response to that danger. The families counter by arguing that, while Park officials had discretion regarding *what* to do

---

[4] Contrary to the dissent's suggestion, we may not simply disregard the complaint's allegation that the government knew of the danger posed by the tree. *See* Dissent at 28–29. Certainly, we need not credit "*legal* conclusions" asserted in a complaint, but we must "assume [the] veracity" of the complaint's "well-pleaded *factual* allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (emphasis added). The complaint's allegations that Park officials were actually aware of the danger posed by the tree because they knew that it had broken in the past and because the tree's remaining limb had begun to bow visibly are not the sort of "[t]hreadbare recitals of the elements of a cause of action" that we may disregard at this stage of litigation. *Id.* at 678.

in response to the danger, applicable policies required officials to do *something*, including at least to warn campers. They argue that the government's failure to do anything at all to mitigate the risk was not subject to the sort of policy choices protected by the discretionary function exception.

1

Once again, the extent and nature of Park officials' discretion over how to address hazardous trees is defined by Yosemite Directive No. 25. As mentioned, the families allege that the tree should have been rated a five or a six under the Park's Seven-Point system—a "high" risk according to Directive No. 25. According to the directive, trees rated "high or above *require* a management action," and "will *require* some type of abatement/mitigation." Though "some type of" mitigation is required, the directive lists a wide range of specific mitigation efforts that NPS officials may undertake—from pruning or repairing the tree to removing it or closing the surrounding area. Accordingly, the government insists that its officials maintained significant policy-based discretion in deciding how best to abate the hazard posed by the tree. This is likely true, and the families may not be able to pursue a claim challenging the government's choice of one mitigation approach over some other. *See, e.g.*, *Chadd*, 794 F.3d at 1113–14 (holding that discretionary function exception shielded NPS officials' decision to implement "non-lethal management options" for an aggressive goat, rather than to kill the goat).

But the government's argument ignores the families' contention that Park officials failed to satisfy their baseline duty to do *something* about the tree. Even if the directive gives officials broad leeway in deciding *how* to abate the danger posed by a high-risk tree, the directive still instructs that they do something toward that goal. But the families

contend—and at this point we assume—the government did nothing at all. Given the requirements of Yosemite Directive No. 25, this fundamental decision of whether to act in any way to abate the hazard remains subject to challenge under the FTCA. *See Navarette v. United States*, 500 F.3d 914, 917–18 (9th Cir. 2007) ("[T]he Army Corps certainly retained discretion as to *how* to mark fence drop offs, but that does not mean it retained discretion *whether* to do so.").

2

The families further claim that Park officials were negligent in failing to warn visitors that the tree was dangerous. Once again, Directive No. 25 makes clear that officials' duty to warn visitors of known dangers is mandatory:

> The park will provide reasonable public information . . . about the known potential for risk of exposure in the park to hazard tree conditions. The intent is to make the public aware of potential tree hazards that are known to exist in developed areas within the park or sections of the park. This information/public outreach should be on a level commensurate with other public safety information . . . .

As for the families' failure-to-warn claim, the government has not identified even a single policy-based consideration that might stop Park officials from notifying visitors about known tree hazards. In its brief, the government simply asserts, without elaboration, that the decision "whether to post a warning" is "subject to policy considerations." The only source cited in support is a provision in Directive No. 25, which states that, prior to

taking any action to abate tree hazards, "a review of resource issues should be made considering the various environmental laws and the resources potentially impacted." But this statement has nothing to do with posting warnings. It specifically applies to the government's consideration of how best to abate the hazard itself, for example by pruning or repairing trees or closing endangered areas of the Park. No similar statement appears following the Directive's separate instruction to "provide reasonable public information" about hazardous tree conditions. Indeed, it makes little sense (and the government does not attempt to explain) how the decision simply to inform Park visitors about known dangers could similarly impact environmental resources. *Cf. Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994) ("A decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic, or political policy decision that the discretionary function exception is intended to protect.").[5]

As with the Park's duty to take *some* action to abate a high-risk tree, fulfilling the Park's duty to inform visitors *somehow* about that risk does not involve considerations of public policy. *See Faber v. United States*, 56 F.3d 1122, 1125 (9th Cir. 1995) ("[A] failure to warn involves considerations of safety, not public policy."); *Sutton*, 26 F.3d at 910 (same). Accordingly, the discretionary function exception does not bar the families' claim that the

_____

[5] When considering whether to dismiss the families' fraudulent concealment claim, the district court made a similar observation: "Defendant has not advanced any argument that the failure to warn, set apart from the decision not to abate the Subject Tree, involved an exercise of discretion." For this very reason, the district court rejected the government's argument that the discretionary function exception barred the fraudulent concealment claim. The same analysis prevents the exception from applying to the families' negligence-based failure to warn claims, as well.

government negligently failed to give Park visitors any warning about the tree.

## III

The families argue that the district court also erred in dismissing their claim that Park officials fraudulently concealed information about the dangers posed by the tree "in order to continue charging camping fees" to visitors. They allege that if they had been informed of such dangers during the campsite reservation process, they never would have camped there.

The district court found that this fraudulent concealment claim was barred by the FTCA's exception for claims "arising out of . . . misrepresentation [or] deceit." 28 U.S.C. § 2680(h). Under such exception, "claims against the United States for fraud or misrepresentation by a federal officer are absolutely barred." *Owyhee Grazing Ass'n, Inc. v. Field*, 637 F.2d 694, 697 (9th Cir. 1981). It goes without saying that the families' fraudulent concealment claim sounds in fraud or misrepresentation. *See Robinson v. Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004) (describing claim as a species of "fraud and misrepresentation"). The families contend, however, that the exception does not apply because their claim seeks damages for personal injury. They insist that, decades ago, our court limited the exception only to cases where the "plaintiff is seeking to recover for *economic loss* suffered as a result of a *commercial decision* the plaintiff made in reliance on a government misrepresentation."

Our cases impose no such limitation. The families are correct that some cases have observed that the exception primarily applies to claims of economic loss flowing from commercial transactions. *See, e.g.*, *United States v.*

*Neustadt*, 366 U.S. 696, 711 n.26 (1961) (observing that the torts covered by the exception are "confined very largely to the invasion of interests of a financial or commercial character, in the course of business dealings" (internal quotation marks omitted)); *Green v. United States*, 629 F.2d 581, 584 (9th Cir. 1980) ("[T]he misrepresentation exception precludes liability where the plaintiff suffers economic loss as a result of a commercial decision which was based on a misrepresentation by [the] government . . . ."). But such cases do not hold that the exception *cannot* apply in other contexts. Indeed, in *Green*—the principal case on which the families rely—we explicitly rejected the notion that the exception applies only to claims for economic loss. *See Green*, 629 F.2d at 584 ("[T]he test is not whether the injury was economic but whether it resulted from a commercial decision based on a government misrepresentation." (quoting *Preston v. United States*, 596 F.2d 232, 239 (7th Cir. 1979))). More recently, we have applied the exception even to claims of personal injury resulting from non-fraudulent failures to warn. *See Doe v. Holy See*, 557 F.3d 1066, 1084 n.10 (9th Cir. 2009) (per curiam); *Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir. 2003).

The only case the families cite in which our court refused to apply the exception to a claim for personal injury is *Ramirez v. United States*, 567 F.2d 854 (9th Cir. 1977) (en banc). In that case, we held that the exception did not bar a claim of medical malpractice based upon a surgeon's negligent failure to warn his patient of certain surgical risks. *Id.* at 856. We explained that the exception was reserved for torts representing a "distinct cause of action" for misrepresentation or deceit, rather than for claims of ordinary negligence that might involve "misrepresentation" in some colloquial sense. *See id.* (internal quotation marks

omitted).    We opined that the exception must not be interpreted so broadly as to swallow claims by "the victim of negligent conduct [and] not of an esoteric form of misrepresentation." *Id.* at 857.

The families argue that *Ramirez* is in tension with later cases like *Doe* and *Lawrence* which applied the exception to bar claims of ordinary negligence.   But no such tension arises here, because the families' fraudulent concealment claim is *not* one of ordinary negligence (or any negligence at all).   Rather, their claim of fraudulent concealment is indeed a "distinct cause of action" for deceit and an "esoteric form of misrepresentation."    *Id.* at 856–57 (internal quotation marks omitted).   Such claim—that the families detrimentally relied on the government's fraudulent misrepresentation in a commercial transaction—bears the hallmarks of traditional misrepresentation claims described in *Ramirez.*   And shortly after *Ramirez*, in *Green*, our court relied on a case in which the Seventh Circuit held that the exception might apply where a governmental misrepresentation in a commercial transaction led to personal or property damages.   *See Preston*, 596 F.2d at 238–39.   In that case, the Seventh Circuit explained that the critical distinction is not the type of harm but rather whether the cause of action is "fundamentally grounded on the common law tort of misrepresentation" or instead "only collaterally involve[s] misrepresentations." *Id.* at 238. The fraudulent concealment claim here is not one that involves misrepresentations only collaterally.   Even if the families are right that a tension between *Ramirez* and later cases like *Doe* and *Lawrence* will need to be resolved at some point, we need not do so now.

The district court did not err in dismissing the fraudulent concealment claim under the misrepresentation exception.

IV

The district court's dismissal of the families' claim for fraudulent concealment is **AFFIRMED**, the court's dismissal of the negligence-based claims is **REVERSED**, and the case is **REMANDED** for further proceedings. Each party shall bear its own costs on appeal.

---

RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court properly dismissed the fraudulent concealment claim. However, I disagree with the majority's conclusion that the district court erred in dismissing the negligence-based claims under the discretionary function exception to the Federal Tort Claims Act.

In my view, the majority goes astray by concluding that the Hazard Tree Management program created a mandatory duty on the part of officials responsible for managing Yosemite National Park. Specifically, the majority relies on Park Directive # 25 as setting forth the mandated duty. *See Majority Opinion*, p.9. But Directive # 25 is replete with references to the exercise of discretion, which by definition negates the concept of a mandated duty. *See Gonzalez v. United States*, 814 F.3d 1022, 1027 (9th Cir. 2016) (referencing a "discretionary act" as falling within the exception); *see also Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1214 (9th Cir. 2001) (noting that even limited discretion fits within the discretionary function exception); *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) (same).

In 2006, the National Park Service (Park Service) published its Management Policies for management of the national park system, including Yosemite. In addressing visitor safety, that policy provides:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The [Park] Service will do this within the constraints of the 1916 Organic Act. The primary—and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.

> . . .

> The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. . . .

The language in this policy is explicitly discretionary. *See Merando v. United States*, 517 F.3d 160, 169 (3rd Cir. 2008) (addressing a prior version of this policy and concluding that nothing in the policy "mandate[d] how the Government should locate or deal with hazardous trees.")

Directive # 25 was promulgated under the auspices of the Pacific West Region Directive for hazard tree management (PW-062). That directive contains similar language of discretion.

The introduction to this regional directive begins with the acknowledgment that natural hazards, including tree hazards, are among the potential dangers inherent in the environment. The directive explains that it "provides *guidance* in the management of tree hazards." (emphasis added).

The directive encompasses the following additional discretionary passages (discretionary language emphasized):

- The primary purpose of this Directive is safety of the visiting public and park employees, *along with conservation of park resources*;

- The management activities identified in this Directive are to be undertaken to the fullest extent feasible and consistent with available resources while still providing for the safety of park operations;

- The program *should* address developed areas as identified by local park managers;

- The Park Superintendent retains discretion to administer the program with available park staff and financial resources in the context of other legal requirements and other considerations;

- Surveys/inspections of tree hazards *should* be made on a regular periodic basis; the frequency of surveys in each developed area *should* be documented in the hazard tree plan. Surveys/inspections

*should* also be made following storms, fires, or other environmental events;

- A park *may consider* the knowledge, experience and judgment of the park's field staff in conjunction with the numerical hazard tree rating system to determine the appropriate management response for a species- and target-specific hazard.

Against this backdrop of national and regional directives granting discretion to Park Superintendents, the Park Superintendent for Yosemite promulgated Directive # 25 to address hazard tree management in Yosemite National Park. As with the national and regional directives Directive # 25 contains express discretionary provisions, including the following (discretionary language emphasized):

- This directive provides *guidance* in the management of tree hazards and any other potentially hazardous vegetation;

- The management activities identified in this directive are undertaken to the fullest extent feasible and consistent with available resources while still providing for the safety of park operations;

- The *objective* of this directive is to provide Yosemite with *a framework* for a hazard tree program that will minimize threats to life and property from the failure of hazard trees within developed areas, *consistent with the [National Park*

*Service] mission of conserving the park's natural and cultural resources*;

• The park superintendent retains discretion to administer the [hazard tree management] program with available park staff and financial resources in the context of other legal requirements and other considerations;

• A rating system [for hazard tree assessment] *should consider* the following [factors];

• A park may consider the knowledge, experience and judgment of the park's field staff in conjunction with the numerical hazard tree rating system to determine the appropriate management response for a species- and target-specific hazard;

• The park will provide reasonable public information . . . about the *known* potential for risk of exposure in the park to hazard tree conditions.  The *intent* is to make the public aware of potential tree hazards that are *known to exist* . . . This information/public outreach *should be* on a level commensurate with other public safety information;

• Where wilderness or backcountry campsites or other developments are designated and assigned by the [National Park Service], e.g. permitted campsites,

these areas *should be* identified for inclusion in the hazard tree management program, and such sites *should be surveyed and hazards abated/mitigated*;

• It is the responsibility of each park superintendent to determine the need for and, as appropriate, to develop, implement, and keep up-to-date a hazard tree management program;

• The regional director *should* ensure that each park has an adequate hazard tree management program.

Comparable discretionary language is present in the corollary Vegetation Management Plan for Yosemite: "*Reasonable and prudent measures should be taken* to protect safety and property. *Hazardous tree and limb conditions should be rated* and abated to provide a *balance between preservation of park resources and protection of people and property*." (Emphasis added).

We have consistently held that language of the type used in these park directives confers discretion, rather than imposing a mandatory obligation. In *Marlys Bear Medicine*, 241 F.3d at 1213, we explained that, in determining whether the discretionary function exception applies we "consider whether the action is a matter of choice." (citation omitted). In other words, if the "ultimate choice is left to the [agency]," discretion is conferred. *Id.* at 1214. We clarified that "[d]iscretion may be either affirmatively conferred or tacitly implied." *Id.* at 1213 (citation omitted). We, therefore, "ask whether the applicable federal standards either explicitly or implicitly gave the [National Park Service] discretion." *Id.*

In this case, discretion was conferred upon the Park Service both explicitly and implicitly. Discretion was conferred explicitly through copious use of the universally permissive terms "may" and "should." *See Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("[T]he word 'may' . . . implies discretion . . ."); *see also Marshall v. Anaconda Co.*, 596 F.2d 370, 375 (9th Cir. 1979) (noting that the "'[s]hould . . . unless' language is clearly [m]ore advisory"); *Sabow*, 93 F.3d at 1452 (describing "should" as "suggestive, not mandatory") (citation omitted). Discretion was conferred implicitly through the embedding of discretionary choices throughout the policies. *See Gonzalez v. United States*, 814 F.3d 1022, 1029 (9th Cir. 2016) ("Courts have consistently held that where, as here, a government agent's performance of an obligation requires that agent to make judgment calls, the discretionary function exception applies."). (citation omitted).

As previously discussed, Directive # 25, which is relied upon by the majority as imposing a mandatory duty upon park officials actually provides quite the opposite, including describing the directive as "guidance" and explicitly retaining discretion in the Park Superintendent to administer the hazard tree management program "in the context of other legal requirements and other considerations." We have concluded that similar language falls within the discretionary function exception. In *Chadd v. United States*, 794 F.3d 1104, 1110 (9th Cir. 2015), we held that the discretionary function exception applied despite the existence of a "mandatory" policy, because the policy contained qualifying language that circumscribed the park's obligation to "what is practicable and consistent with designated purposes and mandates." We also described

"guidance" as "impos[ing] no particular, mandatory course of action." *Id.*

Similarly, in *Miller v. United States*, 163 F.3d 591, 594 (9th Cir. 1998), despite the existence of "mandatory requirements," we held that the discretionary function exception applied. The plaintiffs relied on the language in the Forest Plan requiring forest employees to:

> (1) monitor current and recent fire reports to target specific risks; (2) apply aggressive suppression action to wildfires that threaten assets, including private property, by initial attack; (3) provide equipment outside of the fire management organization to assist in the initial attack; and (4) meet the goal of controlling the fire by directly addressing the fire on the ground and preparing an escaped fire analysis where appropriate.

*Id.* We rejected the plaintiffs' reliance on these standards, holding that "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Id.* at 595 (citations omitted); *see also Sabow*, 93 F.3d at 1453 ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.") (citation omitted).

A similar conclusion is warranted in this case in light of the discretionary framework of which Directive # 25 is a part, and the discretionary nature of Directive # 25 itself. As in *Miller*, Directive # 25 "confers discretion as a part of its general procedure" vesting discretion in the Park Superintendent. *See id.* at 594.

The majority opinion specifically relies upon the Rating System used in Yosemite National Park under Directive # 25 to evaluate "(1) tree failure potential; (2) target damage potential; (3) target impact potential; and (4) target value." However, not only is Directive # 25 itself couched in discretionary terms, the rating system expressly states that the "[d]efect ratings . . . are *usually assigned* and/or *modified on a local/regional basis* and reflect *variations in species and environmental factors*." (emphases added). In addition, the very factors relied upon by the majority are identified as "example[s]" that "may need to be revised for local conditions." The ratings are listed as examples only, and because no instructions are included regarding revisions for local conditions, or how to account for "variations in species and environmental factors," our analysis of similar directives in *Miller* militates toward a similar conclusion—that Directive # 25 did not "eliminate discretion" on the part of forest officials. *Id.* at 595 (noting that although the standards and procedures outlined certain requirements, they did not eliminate discretion because they did not mandate a specific method of complying with those standards).

Finally, and importantly, the majority relies on a conclusory allegation from the plaintiffs that forest officials knew the failed tree was hazardous. This is an important point because Directive # 25 addresses providing information to the public regarding "hazards that are *known* to exist." (emphasis added). Contrary to the majority's assertion, *see Majority Opinion*, p.12, we are not required to accept as true conclusory allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("Rule 8 . . . does not unlock the door of discovery for a plaintiff armed with nothing more than conclusions . . ."); 679 ("[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth"). The only evidence in the record on this issue is the

declaration of Yosemite Park Forester Brian Mattos that he was not aware of any "prior failure incident involving the subject tree," and that it had not been identified as a hazard.

I am persuaded that no meaningful distinction can be made between the facts of this case and our precedent concluding that the discretionary function exception applies to directives that are remarkably similar to Directive # 25. On that basis, I would affirm the district court's judgment in its entirety.