**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PHONG LAM,
        *Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,
        *Defendant-Appellee.*

No. 19-16243

D.C. No.
3:18-cv-00936-LB

OPINION

Appeal from the United States District Court
for the Northern District of California
Laurel D. Beeler, Magistrate Judge, Presiding

Argued and Submitted June 8, 2020
San Francisco, California

Filed October 28, 2020

Before: Milan D. Smith, Jr. and Andrew D. Hurwitz,
Circuit Judges, and C. Ashley Royal,[*] District Judge.

Opinion by Judge Royal;
Concurrence by Judge Royal;
Dissent by Judge Hurwitz

---

[*] The Honorable C. Ashley Royal, United States District Judge for
the Middle District of Georgia, sitting by designation.

## SUMMARY[**]

### Federal Tort Claims Act

The panel affirmed the district court's dismissal of a Federal Tort Claims Act ("FTCA") action alleging that the U.S. Army Corps of Engineers negligently failed to cut down a tree at the Lake Mendocino recreation area that crashed into the plaintiff's tent and smashed his leg.

The FTCA permits private suits against the United States for damages for loss of property, injury, or death caused by a government employee's negligence. The FTCA's discretionary function exception ("DFE") provides that the government does not waive sovereign immunity for tort claims if the alleged tortfeasor was performing a discretionary function or duty when he or she injured the plaintiff. The district court dismissed based on its finding that the FTCA's DFE defeated plaintiff's claims.

In deciding whether the DFE applied, the panel applied the *Berkovitz/Gaubert* test: 1) Did the Lake Mendocino policies allow for discretion? and 2) Were those policies susceptible to the policy analysis the DFE was designed to protect? If the answer to both questions is yes, the DFE applies. First, the panel held that because the Lake Mendocino policies had no specific mandatory requirements for maintaining, identifying, or removing dangerous trees, the Lake Mendocino maintenance worker had discretion to act according to his judgment in assessing trees. The panel

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held further that this discretion satisfied the first part of the *Berkovitz/Gaubert* test. Second, the panel held that park rangers' decisions as to tree maintenance were susceptible to policy considerations. The panel concluded that the DFE applied in this case.

District Judge Royal concurred, and wrote separately to address the dissent.

Judge Hurwitz dissented because the majority's decision conflicts with the precedent in *Kim v. United States*, 940 F.3d 484, 487-90 (9th Cir. 2019), which held that governmental immunity does not apply to precisely the governmental decision at issue in this case. He wrote that this case does not call on the court to judge the wisdom of any social, economic, or political policy, but rather simply to perform the familiar role of determining whether the government agent exercised reasonable care.

## COUNSEL

Robert V. Chin (argued), Law Office of Robert V. Chin, San Rafael, California, for Plaintiff-Appellant.

Julie Bibb Davis (argued), Assistant United States Attorney; Sara Winslow, Chief, Civil Division; David L. Anderson, United States Attorney; United States Attorney's Office, San Francisco, California; for Defendant-Appellee.

**OPINION**

ROYAL, District Judge:

During the 2014 July Fourth weekend, Phong Lam ("Lam") was asleep in the Lake Mendocino recreation area when a tree crashed into his tent and smashed his foot. Lam sued the United States under the Federal Tort Claims Act ("FTCA") and alleged that the Army Corps of Engineers ("Corps") negligently failed to cut down the tree. The Government filed a 12(b)(1) Motion to Dismiss Lam's complaint for lack of subject matter jurisdiction, and the district court granted the motion after finding that the FTCA's Discretionary Function Exception ("DFE") defeated Lam's claim.[1] Lam appeals that ruling.

This panel has jurisdiction under 28 U.S.C. § 1291 to review a district court's final decision. We review the district court's dismissal for lack of subject matter jurisdiction *de novo*. *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995). And we accept the district court's factual findings on all jurisdictional issues unless they are clearly erroneous. *Sabow v. United States*, 93 F.3d 1445, 1450 (9th Cir. 1996), *as amended* (Sept. 26, 1996).

The issue in this case is simple. This panel must decide if the district court erred in ruling that the FTCA's discretionary function exception shields the Government from liability for Lam's injuries. Ultimately, this case turns on the Corps' policies. Because those policies are not

---

[1] With the parties' consent, United States Magistrate Judge Laurel Beeler wrote the order for the district court.

mandatory and allow for discretion, and that discretion is susceptible to policy analysis, we **AFFIRM**.

## I.  Facts and Procedural Background

A 60-foot interior live oak buckled and crashed into another tree and that tree collapsed onto Lam's tent while he and his family slept at the Kyen campground at Lake Mendocino. Lake Mendocino ("the Lake") is a recreation area built and operated by the Corps for camping, boating, swimming, picnicking, fishing, and hiking. Half a million people visit the Lake each year. Kyen is one of six recreation areas, and it has 93 campsites. Oak woodlands dominate in Kyen. Corps employees maintain the campsites and the surrounding trees.

In 2014, the Corps employed Wayne Shull ("Shull") as a maintenance worker at Lake Mendocino where he had managed the trees since 2007. The United States Forest Service had certified Shull as a chainsaw operator and as a tree climber and had trained him to identify and remove hazardous trees.  For nine years before the oak fell on Lam's tent, Shull had patrolled the park looking for dangerous trees, and he was familiar with the tree that injured Lam.

During his daily foot patrols, Shull looked for trees with dead spots, foliage loss, cankers, fungi, or trees with dead branches that would signal a threat. If a tree looked dangerous, he would remove it the same day or first thing the next morning. If the tree did not pose an immediate threat, he would make a mental note and return when he had time to remove it.

Shull said that he had inspected this oak tree before it fell, but he never saw any reason to believe that it was dangerous.  He saw no signs of distress in the main tree bole,

such as fungi, cracks, the presence of insects, insect damage, or signs of disease; and the tree canopy was green and healthy. When he examined the tree after it fell, he saw that its roots had broken off, and that it had fallen on a cluster of trees next to it. He also found rot in the roots and in the center bole that he could not have seen when the tree was standing.[2]

Lam countered the Government's case with an expert arborist, Dr. Kent Julin. Dr. Julin has a doctorate in forestry, and he specializes in assessing tree-risks. He disagreed with Shull and said that Shull could have seen the rot before the tree fell. He further explained that the tree had two large holes in the lower trunk that had been there for at least 20 years. He thought the tree was a hazard, and it should have been cut down. Lam relied on Dr. Julin to establish the government's negligence and for his opinion that the American National Standards Institute ("ANSI") A300, part 9 standard imposed a mandatory duty to cut down the tree.

After a hearing, the district court granted the Government's Motion to Dismiss for lack of jurisdiction finding that the DFE barred Lam's claims. The court specifically found the ANSI standards did not apply to tree maintenance at Lake Mendocino, and no mandatory policy barred DFE immunity. The court also found that decisions about tree safety were susceptible to policy analysis. Accordingly, the court entered judgment for the Government.

---

[2] The government also offered the testimony of two other employees, Christopher Schooley, the park manager, and Lance Pool, a park ranger, who examined the tree after it fell. They both opined that the tree showed no signs of distress before it fell.

## II. Analysis

As previously stated, this appeal turns on the Corps' policies. In reaching its ruling, the district court carefully examined the Lake Mendocino policies and found ample evidence of discretion. Before analyzing these policies in this opinion, it helps to review the law on the discretionary function exception, and then armed with these established legal concepts, turn to the plain language of the policies. Understanding the complex law in this area and how it applies to the Lake Mendocino policies is especially important in Lam's case because, as this Circuit acknowledged in *Terbush v. United States*, "our case law may not be in complete harmony on this issue," i.e., discretion in national park safety cases. 516 F.3d 1125, 1136 (9th Cir. 2008).

### A. The Discretionary Function Exception

#### i. *DFE Supreme Court Cases and the Berkovitz/Gaubert Test*

The United States has sovereign immunity and cannot be sued without its consent. One important immunity waiver that allows suits against the federal government is the FTCA. The FTCA permits private suits against the United States for damages for loss of property, injury, or death caused by a government employee's negligence. *See United States v. S.A. Empresa de Viaco Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). Liability arises for these acts if a private person would be liable to the claimant under the law of the place where the act or omission occurred. *Id.*; 28 U.S.C. §1346(b)(1). Such acts are typically "ordinary common-law torts." *Dalehite v. United States*, 346 U.S. 15, 28 (1953). The government can be held liable in tort "in the

same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

The DFE, however, is an important exception to the FTCA. The government does not waive immunity for tort claims if the alleged tortfeasor was performing a discretionary function or duty when he or she injured the plaintiff. This is true even if the employee abused that discretion. 28 U.S.C. § 2680(a). This kind of abuse is typically simple negligence. So, if the DFE applies, it defeats a plaintiff's FTCA action. The applicable code section explains when immunity is not waived, or stated another way, which claims *cannot* go forward:

> Any claim based upon an act or omission of an employee of the government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Therefore, where the DFE applies, the United States has not waived its sovereign immunity, and the district court lacks subject matter jurisdiction over a plaintiff's claim. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002). Four key Supreme Court cases, *Dalehite v. United States*, *United States v. Varig Airlines*, *Berkovitz v. United States*, and *United States v. Gaubert*, explain how this defense works and describe the analysis a court should follow to test if the DFE applies.

To succeed in district court under the FTCA, a plaintiff must have suffered an injury, a federal employee must have caused that injury, and state law must offer a legal theory that makes that employee's negligence actionable. *Varig Airlines*, 467 U.S. at 808. But proving these three elements is not enough if the government has a viable DFE defense. If the government can show that the alleged injury arose out of the employee's discretionary acts, then the district court must dismiss plaintiff's case. Discretion is the watchword, the byword of the DFE. Central then to the early stages of a plaintiff's FTCA claim is the discretion question, and the district courts typically deal with the DFE when the government either files a motion for summary judgment or, as in this case, a motion to dismiss.[3]

The government has the burden to prove this defense, so to win dismissal, it must show that the DFE applies because the employee's acts were discretionary. *GATX/Airlog Co.*, 286 F.3d at 1174. If the employee acted with discretion, the DFE restores the government's immunity, and plaintiff loses. The DFE is intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through

---

[3] Lam argues that the district court erred by failing to convert the Government's Motion to Dismiss to a motion for summary judgment because his expert created triable issues of material fact. We disagree. The purported expert affidavit Lam relied upon from Dr. Julin is in itself a legal nullity because it opined on the ranger's potential negligence; however, it is well-established that negligence is not part of the discretionary function exception analysis. *See Chadd v. United States*, 794 F.3d 1104, 1111 (9th Cir. 1015) ("[W]hether reasonable care required such action goes to the merits of Chadd's negligence claim[…][,] but at step one of the of the discretionary-function-exception analysis all that matters is that there was, in fact, discretion."). Moreover, Lam has waived this argument because he did not raise this issue below. *Id*. at 1110 n. 4.

the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814. And as the Supreme Court further said about FTCA immunity, "[i]t is neither desirable nor intended that the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act should be tested through the medium of a damage suit for tort." *Id.* at 809.

Accordingly, "[w]here there is room for policy judgment and decision there is discretion." *Dalehite*, 346 U.S. at 36. So, if the policies allow an employee to make independent policy judgments, then the DFE defeats plaintiff's claim. *Berkovitz v. United States*, 486 U.S. 531, 536, 546 (1988). But if the "policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exemption does not bar a claim that the act was negligent or wrongful." *Id*. at 546–47.

Furthermore, because the discretionary or non-discretionary nature of the acts are the focus of the DFE, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines*, 467 U.S. at 813. Importantly, the DFE covers all employees exercising discretion, not just planners, administrators, and regulators. *Id*. Indeed, "the acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Id.* at 811.

Moreover, whether the discretion involved was abused makes no difference; the government will still prevail. 28 U.S.C. § 2680(a); *see also Varig Airlines*, 467 U.S. at 808. This means that even if the employee's discretionary act is negligent, the district court should dismiss plaintiff's case. Indeed, in *Dalehite*, the Supreme Court repeatedly

states that negligence is not an issue in the DFE analysis. 346 U.S. at 30–32. And the "degree of care used in performing the activities are irrelevant to the application of that doctrine." *Id*. at 45–46. Thus, courts should put the negligence issue aside on a DFE-based motion to dismiss and focus its inquiry on whether the employee's acts were discretionary. This most often means that the court must examine the applicable government policies to see if they authorize or imply discretion or if they mandate specific duties.

It is not just any discretion, however, that triggers the DFE. The Supreme Court has created a two-part test, known as the *Berkovitz/Gaubert* test, to determine the types of discretionary acts covered by the DFE. First, "conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536. Second, the court must decide if "that judgment is of the kind that the discretionary function exception was designed to shield." *Id*.

"The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Id*. Following *Berkovitz*, this Circuit aptly explained that "the key inquiry is not whether the government employee has a choice, but whether that choice is a policy judgment." *Arizona Maintenance Co. v. U.S.*, 864 F.2d 1497, 1503 (9th Cir. 1989). This raises the question about what public policy considerations support the DFE. More specifically, did the employee's acts involve "the permissible exercise of policy judgment?" *Berkovitz*, 486 U.S. at 537.

*Berkovitz* offers some rules for analyzing policy judgments. The DFE "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id*. at 536. This is very

important. If the policy is mandatory, it cannot be discretionary. An employee has no discretion to deviate from mandated procedures. *Id*. at 544. Guided by this directive, the court must look at the policies to see if they mandate certain actions that the employee failed to follow. If so, that defeats the DFE.

If, however, the policies are not mandatory but rather directly or implicitly give discretion to the employee, the DFE defense survives this first step. It survives "because if the policies…allow room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion." *Id.* at 546. But the Supreme Court offers more insight into dealing with the thorny discretion issue.

The fourth Supreme Court case on the DFE is *United States v. Gaubert*, 499 U.S. 315 (1991). *Gaubert* offers additional guidance on how to analyze the DFE. In *Gaubert*, the Supreme Court explained that:

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be *presumed* that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation,

> but on the nature of the actions taken and on whether they are *susceptible* to policy analysis.

*Id.* at 324–325 (emphasis added). So, if the policies allow the exercise of discretion in tree maintenance, the agent's acts or failures to act are presumed to be discretionary. In other words, if the Corps' policies allow discretion, then this panel should presume that Shull and other Corps employees acted with discretion.

It follows then that to avoid dismissal, a plaintiff must allege facts that support a finding that the government employee's negligence was not grounded in policy judgments. Furthermore, and very importantly, the district court must not focus on or even consider the employee's actual thinking about what to do or not do, or the status of the employee, or the "routine or frequent nature" of the discretionary act. *See Gaubert*, 499 U.S. at 334. The court, however, must consider whether the actions the employee took were *susceptible* to policy analysis. *Id*. at 326.

That means in this case the Corps does not have to show that Shull or some other Corps employee analyzed or considered policies about managing trees in general or this oak tree in particular. If managing trees was susceptible to policy analysis, then the Corps will prevail on the DFE defense.

### ii. Ninth Circuit DFE Cases Applying the Berkovitz/Gaubert Test

It is important now to move from the Supreme Court cases on the DFE to those Ninth Circuit opinions that apply the Supreme Court's analysis. The following five Ninth Circuit opinions control the analysis and show that to

properly analyze Lam's case, we must closely scrutinize the Corps' policies in their totality to determine whether they are discretionary or mandatory.

In *Childers v. United States*, an 11-year-old boy died after falling off an icy, unmaintained mountain trail in Yellowstone National Park. 40 F.3d 973 (9th Cir. 1994), *as amended* (Jan. 17, 1995). The plaintiffs argued that the National Park Service ("NPS") knew that the unmaintained trail was dangerous in winter; therefore, the NPS had a duty to warn of the danger that was not discretionary. The plaintiffs also argued that NPS safety manuals required warning signs. *Id.* In other words, the NPS allegedly violated its own mandatory standards. *Id.* The government responded that the policies were not mandatory, and the park rangers had discretion to balance competing policy concerns. *Id.* at 974–75.

The *Childers* panel agreed with the government and held that the DFE protected the NPS employees' decisions regarding trail maintenance. The panel largely adopted the findings of the district court that the NPS policies left it to the park employees' discretion to post signs or close trails, and this discretion satisfied the first part of the *Berkovitz/Gaubert* test. *See id.* at 975–76.

On the second part of the *Berkovitz/Gaubert* analysis, the panel accepted the government's argument that park rangers had the discretion to balance competing policy concerns. As the court explained: "Although the Childers insist that several park guidelines make the posting of warning signs and other decisions nondiscretionary, the record points to a statute, … regulations, and guidelines which leave these decisions, either explicitly or implicitly, in the hands of NPS rangers." *Id.* at 975–76. Hence, the panel affirmed the district court's ruling on immunity. This case shows how

closely courts should look at the policies to determine whether they are discretionary or mandatory.

In another tragic case, *Valdez v. United States*, the plaintiff fell 90 feet off Ella Falls in Kings Canyon National Park and broke his back. 56 F.3d 1177 (9th Cir. 1995). Among other negligence claims, he alleged the NPS failed to warn about the dangers at the falls. Again, in this case, plaintiff contended that the NPS policies imposed mandatory safety duties for park rangers. The panel disagreed and found that the policies outlined general policy "goals" for visitor safety, not mandatory requirements. As the panel explained, "[t]hese guidelines can be considered mandatory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions." *Id.* at 1180.

Specifically on the warning claim, the *Valdez* panel found that the NPS's Loss Control Management Guidelines' broad mandate to warn about special hazards "through educational materials, brochures, pamphlets, and the like necessarily encompasses an element of discretion in identifying such hazards." *Id.* As the court explained, it is too much to ask the NPS to warn about everything. Such decisions implicate public policy concerns and are therefore discretionary. *Id.* Again, we see that the court should look at all the relevant policies in their totality and how they fit together to determine if they are discretionary or mandatory.

In *Morales v. United States*, a helicopter pilot struck an unmarked cable suspended 40 feet above the Verde River in the Prescott National Forest. 895 F.3d 708 (9th Cir. 2018). The cable was virtually invisible from more than 100 feet away. The cable was not marked because it did not meet the criteria for marking under United States Geological Survey's ("USGS") standards. No statute, regulation, or rule required marking cables below 200 feet, so "the decision of whether

to mark the cableway was a result of considered judgment and choice." *Id*. at 714. The panel recognized that factors such as safety interests, installation and maintenance costs, and the natural beauty of the river showed that no "course of action" was mandated. *Id.* That took care of the first step of the *Berkovitz/Gaubert* inquiry.

The panel then considered whether deciding not to mark the cable was "susceptible to policy analysis grounded in social, economic, and political concerns." *Id*. The panel enumerated several policy concerns including the risk of confusing pilots who expected cables to be marked at 200 feet or above and the risks to USGS employees in installing and maintaining the markers; the costs for installing and maintaining the cable markers; the likelihood of vandalism; and the environmental choices about minimizing the visual distractions around the Verde River, which is designated as a "Wild and Scenic River." *Id*. at 715. These policy considerations satisfied the second part of the *Berkovitz/Gaubert* test.

But the most important ruling in *Morales* involved the question about whether the DFE even applied in safety cases. The plaintiff argued that the DFE did not apply to public safety decisions. The panel disagreed. It explained that "[t]his sweeping exemption would severely undermine the discretionary function exception and is unsupported by our precedent. In case after case, we have considered the government's balancing of public safety with a multitude of other factors." *Id*. at 716. The panel further explained that it is only in cases where the government has no evidence of policy discretion to support DFE immunity that the immunity does not apply. *Id*.

Next, in *Gonzalez v. United States*, the panel found that the DFE immunized the FBI for failing to disclose a possible

home invasion by the Minutemen American Defense gang. 814 F.3d 1022 (9th Cir. 2016). The Minutemen opposed illegal immigration and patrolled the Mexican border searching for illegal aliens. The FBI got a tip that members of the gang planned to invade a home to steal drugs, weapons, and money. Several days later three members of the gang attacked the Gonzalez's home, killed the plaintiff's husband, wounded the plaintiff, and killed her daughter. *Id.* at 1025–26. The wife sued the FBI for not alerting local law enforcement to the danger so that she and her family could have been protected from the threat.

The *Gonzalez* panel applied the proper two-part analysis and found that the DFE immunized the FBI. The panel reviewed the Attorney General guidelines for the FBI. Although factually quite different from a tree safety case, the opinion guides us in interpreting certain policy language, especially the use of the word "shall." The FBI policy said:

> When credible information is received by an FBI field office concerning serious criminal activity not within the FBI's investigative jurisdiction, the field office *shall* promptly transmit the information or refer the complainant to a law enforcement agency having jurisdiction, except where disclosure would jeopardize an ongoing investigation, endanger the safety of an individual, disclose the identity of a human source, interfere with a human source's cooperation, or reveal legally privileged information. If full disclosure is not made for the reasons indicated, then, whenever feasible, the FBI field office *shall* make at least limited disclosure to a law enforcement agency or

> agencies having jurisdiction, and full
> disclosure *shall* be made as soon as the need
> for restricting disclosure is no longer present.

*Id*. at 1029 (emphasis added). Note that the word "shall" is used three times in this guideline. "Shall" typically means mandatory, but the panel did not find that the word "shall" controlled the DFE question. The panel described the many judgments that FBI agents had to consider before disclosing possible criminal activity. *Id.* at 1032.

This decision teaches the importance of analyzing policies that contain mandatory words in their overall context. The panel said that "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Id*. at 1030. Furthermore, viewed in the context of that case, "mandatory-sounding language such as 'shall' does not overcome the discretionary character of the Guidelines." *Id*. As a result, the DFE immunized the FBI's actions. Hence, we must compare any mandatory words in the Lake Mendocino policies with the overall scope of the policies to see if, in their totality, the policies are mandatory or discretionary. The use of a few mandatory words like "shall" does not create a mandatory policy if the policy otherwise allows for discretion.

Finally, in *Chadd v. United States*, a 370-pound mountain goat gored a hiker's femoral artery, and he bled to death. 794 F.3d 1104 (9th Cir. 2015). National Park Service officials in Olympic National Park knew that this goat and other goats had become habituated to park visitors. They also knew that they had a mountain goat problem because park visitors had complained that goats were standing their ground, following or chasing people, rearing up, and pawing

the ground. *Id*. at 1107. They had become aggressive and threatening.

Recognizing this problem, park officials began to warn visitors verbally and with trail signs. They also shot goats with paintballs and bean bags to change the goats' behavior. In fact, park rangers had considered relocating the goat that killed the hiker to another park because that goat had become increasingly aggressive. But the rangers spared the goat. *Id*.

Susan Chadd, the deceased hiker's wife, filed a complaint and alleged that park officials were negligent in not killing the goat until after it had killed her husband. In analyzing the DFE issue, the court noted that park policies did not mandate what should be done with an aggressive mountain goat, so park rangers had discretion in how to solve the goat problem. *Id.* at 1110, 1111. That shifted the legal question from the first step of the *Berkovitz/Gaubert* test to the second step.

On the second step, the panel asked if the rangers' responses to the goat threat were of the kind that Congress intended the DFE to protect; that is, were they susceptible to policy judgments. *Id*. at 1109. Importantly, the panel noted that if park policies and regulations allowed discretion, there is "a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id*. (citing *Gaubert*, 499 U.S. at 324). The panel found that the DFE immunity applied to the acts described above. This decision is important because it emphasizes the *Gaubert* presumption that flows from discretionary policies. These five Ninth Circuit opinions show the elements for the proper analysis for Lam's case.

Lam's counsel argues that *Kim v. United States*, 940 F.3d 484 (2019), should control this panel's ruling because it is a tree safety case. The *Kim* panel found that the DFE did not apply when two young boys were killed after a tree limb fell on their tent. But that case turned on Directive 25, part of Yosemite National Park policies. *Id.* at 488. And as the panel explained, once the Park officials undertook to inspect the trees in the park, they had to follow the established policies. *Id*.

Directive 25 set forth the "Hazard Tree Management" program with a Seven Point system that required documenting and quantifying hazardous trees with a rating system. As the panel described it: "The system provides specific criteria for how to rate each component based on the tree's visible features and the nature of the surrounding area. Trees with a total rating of five or higher are considered 'high' risks and, according to directive, 'will require some type of abatement/mitigation.'" *Id*. Here, nothing in the Corps' policies at Lake Mendocino even approaches the level of specificity found in Directive 25 or requires or mandates abatement or mitigation of certain trees. Thus, *Kim* does not control or assist in deciding the outcome of Lam's case.[4]

Now, armed with this Supreme Court and analogous Ninth Circuit precedent, we turn to the relevant Corps policies governing Lake Mendocino and how the above precedent dictates the outcome of this case.

---

[4] Two out-of-circuit cases help with analyzing dangerous tree cases. *Merando v. United States*, 517 F.3d 160 (3rd Cir. 2008) and *Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993). In both cases, those circuits found that the DFE applied.

## B.  Analyzing the Lake Mendocino Policies

### i.  *The Applicable Policies are Discretionary*

Above, we have outlined the Supreme Court precedent for the *Berkovitz/Gaubert* test and its Ninth Circuit progeny. We now apply this precedent to the plain language of the policies that controlled the actions of Shull and the Corps' employees at Lake Mendocino. In doing so, we must answer two questions: 1) Did the policies allow for discretion? and 2) Were those policies susceptible to the policy analysis the DFE was designed to protect? Because the answer is yes to both questions, the DFE applies.

The relevant policies are found in the Operational Management Plan (OMP), Engineering Manual 385-1-1 ("EM 385-1-1"), specifically Section 31, and Engineering Manual 1110-1-400: Engineering and Design Recreation Facility and Customer Services Standards. Lam argues that the ANSI A300 Part 9 also applies and imposes mandatory duties for identifying and removing hazardous trees. But, as explained below, that argument is wrong.

First, we turn to the OMP. The OMP by its own terms is meant as a "guide"; it "*guides* use, development, and management of the natural and man-made resources." It states that its "Guiding Objectives" are to:

> Maintain a diversity of productive fish and wildlife habitat for both game and non-game species, accomplished through: woodland management and other vegetative manipulation; grassland maintenance and preservation; fisheries enhancement; other management practice. . . .

How to best follow this guide, however, is left to the Lake Mendocino rangers' discretion. That is not to say that there are no general requirements for rangers inspecting, maintaining, and removing trees, only that the OMP does not specify how to carry out these general requirements.

Generally, rangers should conduct "daily maintenance/safety inspections" in all "developed recreational areas," as well as safety inspections for the ranger to "survey operational activities, facilities, equipment, and procedures for safety hazards. Personnel will take or recommend actions necessary to remove or isolate hazards. The appointed Safety Officer will conduct such safety inspections as directed or as requested." Although the OMP does require daily inspections, there is no requirement, checklist, or criteria for how to conduct these inspections or what they should cover. That is left out of the policy language and left up to the ranger's discretion. *See Morales*, 895 F.3d at 714 (finding where no specific guidance was provided in the policy, "employees were left to exercise their judgment").

Additionally, for maintaining and preserving trees, rangers should implement a tree pruning program to remove dead trees, limbs, and snags before they become a public hazard. And maintenance staff is tasked with improvement cutting and thinning of trees for both safety and aesthetic reasons. Although the OMP has a Five-Year Plan, Task 9, for Hazard Tree Removal, Task 9 includes only the following general information:

Initiation Date: October 2013

Completion Date: May 2014

Cost: $2800 (volunteer labor value - $22,320)

Description: Removal of approximately 40 hazard trees

Manpower Requirements: 1 COE Ranger plus CDC labor

Equipment Requirements: chainsaws, protective gear, splitter

Therefore, although the Corps is required to remove dead trees and dead limbs, no mandatory criteria exist for identifying hazardous trees. Here, the tree that harmed Lam was not dead. In addition, the OMP contains no specific mandate for what constitutes a weak, damaged, diseased, or undesirable tree. Although the OMP implements a time frame for removing trees, a budget, an approximation of how many trees to remove, and even the equipment and manpower requirements for cutting trees, it mentions no specific criteria for identifying dangerous trees. *See Valdez*, 56 F.3d at 1180 (finding that while the "policy guidelines certainly outline general policy goals regarding visitor safety, the means by which NPS employees meet these goals necessarily involves an exercise of discretion"). In other words, the very nature of these general requirements allows the exercise of Corps employees' judgment and discretion.

Indeed, implementing the general OMP requirements is left to the Park Ranger. The Ranger is to "consult the OMP Five Year Program to prepare annual work plans and reappraise wildlife habitat conditions." And for maintenance, the OMP states, "the need for maintenance of constructed habitat will be determined through program monitoring and observation. Priority of maintenance will be determined by Senior Park Ranger, depending on available manpower and funds." In other words, it is up to the Senior Park Ranger to use his judgment in carrying out the OMP

requirements while weighing policy choices, such as costs and available volunteers.

And because the OMP contains no criteria or mandates for identifying and removing hazardous trees, it implies that employees like Shull will exercise discretion and make policy judgments. The absence of mandatory language about safety risks gives much discretion to Corps employees. *Berkovitz*, 486 U.S. at 546 (noting that where policies "allow room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion"). So, because the policies in the OMP are discretionary, they fall squarely within the DFE.

But Lam does not rely solely on the policy language in the OMP. He argues that the ANSI A300, Part 9 standard imposes specific mandates for identifying and removing hazardous trees that defeat the DFE. This argument fails because a straightforward reading of policies does not support it. Yes, the ANSI standards are mentioned twice in the policies. But they are listed as a "reference" in EM 385-1-1 and as a general requirement in EM 1100-400-1. Neither of these manuals specifies how to identify or assess unsafe trees.

EM 385-1-1, Section 31, as the district court rightly determined, deals exclusively with mandatory safety requirements applicable to Corps employees who engage in the process of removing trees, as well as the proper safety methods for pruning, felling, and chipping trees. These requirements apply to the safety of Corps employees, not the safety of the general public. EM385-1-1, Section 31 has nothing to do with methods for maintaining or identifying dangerous trees. Moreover, the ANSI A300 standards are listed as a "reference" in this manual, and a reference is not

a requirement. Likewise, EM 1110-1-400 does not deal with tree maintenance or hazard assessment or specify methods required to perform those tasks. In fact, Lam does not even address, or rely on EM 1110-1-400 in his brief. Thus, the ANSI standards do not preclude sovereign immunity under the DFE.

Even if the ANSI standards applied, they are inherently discretionary. They are guidelines for devising a tree assessment plan in which "[o]bjectives shall be based on the context of the situation and client expectations." They do not impose a tree assessment plan, and "they are *not* intended to be adopted in their entirety into laws and regulations or as work specifications without additional information and clarification." *See Valdez*, 56 F.3d at 1180; *see also Gonzalez*, 814 F.3d at 1030 (finding the existence of some mandatory provisions "does not transform an otherwise suggestive set of guidelines into binding agency regulations") (citation omitted). To the extent in which the ANSI standards are used, they allow for judgment and discretion on the part of the tree professionals to use them for their specific context and needs. Thus, Lam's arguments that the ANSI standards, specifically A300, Part 9, are mandatory, fail.

Because the Lake Mendocino policies have no specific mandatory requirements for maintaining, identifying, or removing dangerous trees, Shull had discretion to act according to his judgment in assessing trees. This discretion satisfies the first part of the *Berkovitz/Gaubert* test. Now we will turn to the second part of the test.

### *ii. The Rangers Decisions as to Tree Maintenance Were Susceptible to Policy Considerations*

As an initial matter, and as noted above, there is a presumption that where the express or implied government policy "allows a government agent to exercise discretion, it must be *presumed* that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324 (emphasis added); *see also Chadd*, 794 F.3d at 1104 (same). Although we accept this presumption, our analysis need not rest on the presumption because here, the OMP specifies various park policy considerations to be weighed, considered, and balanced in making decisions for Lake Mendocino, including:

- The objective to provide "the highest possible recreational experience for the least amount of expenditure."

- The objective to provide "quality recreational experiences to a wide spectrum of the public while ensuring maximum sustained use of park resources consistent with their carrying capacity and aesthetic and biological values."

- Safe and healthful recreation opportunities for visitors."

- "Protection of resources."

- "Preservation & [e]nhancement of aesthetic integrity of park resources[.]"

The OMP also notes specific policy considerations as to the removal of trees:

- "Since *cutting of trees is [a]esthetically undesirable* and conflicts with recreational usage, it's done during non-peak recreation seasons whenever possible."

- "[A] mature tree, if destroyed, will leave a void that will take years to replace. Therefore, it is extremely important that all operation and maintenance activities be *conducted in a manner that will minimize negative impacts on desirable vegetation*."

So, according to the terms of the OMP, the decision of whether to cut down a tree is susceptible to competing policy considerations. One goal is to maximize recreation opportunities while another goal is to protect resources. One cannot maximize both. These goals also include preserving and enhancing park resources and aesthetics. Keeping the Lake beautiful will eventually compete with maximizing play. And aesthetics is a policy issue. *See ARA Leisure Services v. U.S.*, 831 F.2d 193, 195 (9th Cir. 1987) (finding that deciding not to put up guardrails was grounded in social and political policy because NPS policies required that roads be designed to be "aesthetically pleasing" and to go "lightly upon the land utilizing natural support wherever possible."). Not to mention that live oaks "provide food and cover for the acorn woodpecker, red-shafted flicker, titmouse, nuthatch and scrub jay" among other wildlife. Indeed, both Shull and Schooley reiterated in their affidavits that the OMP "provide[s] guidance to balance competing policy considerations that impact tree management decisions, including: public safety, employee safety, ecology, wildlife preservation, staffing and budgetary constraints, and park aesthetics."

These competing policy considerations, such as safety, budget, staffing, wildlife and habitat preservation, impact on the natural vegetation, and aesthetics are all the type of policy decisions that are protected under the DFE. *See, e.g.*, *Valdez*, 56 F.3d at 1180 ("Here, the challenged conduct clearly implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards."); *Childers*, 40 F.3d at 976 (noting DFE applied where policy considerations included the need to "balance access with safety, and take into account conservation and resources"). It is sufficient that Shull's decisions would be susceptible to these policy considerations; he need not have actually weighed them. *Gonzalez*, 814 F.3d at 1034 ("The discretionary function exception applies so long as the challenged decision is one to which a policy analysis could apply.").

Moreover, this is not a case where no evidence exists in the record indicating policy considerations. For example, in *Summers v. United States*, the plaintiffs alleged that the government had failed to warn visitors at Rodeo Beach of the hazards of stepping on hot coals at the beach's fire pits. 905 F.2d 1212, 1214 (9th Cir. 1990). In that case, the government offered "no evidence . . . that NPS's failure to post warnings of the sort that would have prevented [the plaintiff's] injury was the result of a decision reflecting the competing considerations of the Service's sign policy." *Id.* at 1215.

Here, social and political policy questions, maximizing aesthetics, and conserving natural resources inevitably become competing interests, especially when you add the public's full enjoyment of the Lake. Competing interests and policy concerns require balancing and weighing; balancing

and weighing involve discretion; and policy discretion invokes the DFE. As noted above, in *Childers*, the plaintiffs argued that failure to warn of known dangers on an icy mountain trail was not discretionary. But the panel disagreed, and in affirming the DFE defense, the panel said: "Park rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety. This decision was precisely the kind the discretionary function exception was intended to immunize from suit." *Childers*, 40 F.3d at 976. Lam's case is in line with *Childers*, *Valdez*, *Morales*, and *Gonzalez*, and as such, Lam's argument that these are not the type of policy considerations protected under the DFE fails, and the DFE applies in this case.

## III.   Conclusion

Lam has not shown any specific mandatory duties, he has not defeated the *Gaubert* presumption, and he has not negated the evidence of discretion for policy judgments. The DFE applies. The district court properly dismissed Lam's case, and we affirm.

**AFFIRMED.**

---

ROYAL, District Judge, concurring:

I write separately to address the dissent.

First, the dissent contends that *Kim* should control this court's analysis, in part, because this case does not involve a policy question. Rather, it turns on technical questions about inspecting and removing a dangerous tree. But as explained

above, although factually very similar, the policies are very different. In *Kim*, the technical requirements were written into the policies, but here they are not. The Lake Mendocino policies allow broad discretion; the Yosemite National Park polices were technical and tight, which left the park rangers with technical considerations alone. This is the decisive difference in the two cases and the reason *Kim* does not control our ruling.

Second, the dissent cites *Oberson v. U.S. Department of Agriculture, Forest Service*, 514 F.3d 989 (9th Cir. 2008), to support reversal. But in that case, unlike Lam's case, the government offered no evidence "that its failure to post a warning was the result of a policy decision." *Id.* at 997. As the court explained: "In the absence of any evidence that the failure to post a warning or remedy the hazard was the product of a policy choice, we conclude that the discretionary function exception did not shield the Forest Service from liability." *Id.* 998. But, to the contrary, here the government offers substantial evidence of policy discretion.

Third, the dissent cites *Nanouk v. United States*, No. 19-35116, —F.3d —, slip op. at 20 (9th Cir. Sept. 2020). In that case the plaintiff asserted three negligence theories against the government for failing to clean up toxic PCBs that leaked into her property from an abandoned radio relay station in Alaska. This court affirmed the district court's ruling in the government's favor on Nanouk's first two claims because the DFE applied. *Id.* at 4.

Plaintiff's first claim involved negligent supervision of government contractors who dumped PCBs on the ground. Plaintiff's second cause of action claimed that the government was too slow in remediating the polluted worksite, which caused PCBs to leech into her property. *Id*. Note that both theories involved the implementation stage.

The district court did not find against the government on Nanouk's third claim, in which Nanouk alleged that the government failed to discover and remediate a PCB hot spot sooner, which damaged her property and her health.

This court reversed the district court's ruling on the third issue but only to remand it for further consideration. The panel explained that "we are unable to determine whether the government's decisions were 'grounded in social, economic, and political policy.'" *Id.* at 7 (quoting *Varig Airlines*, 467 U.S. at 814). Unlike in Lam's case, the government offered no factual showing to defeat Nanouk's third claim. And as this court noted in *Nanouk*, "[t]he key factor in identifying judgments that are protected by the discretionary function exception is the presence of 'competing policy considerations' that must be weighed." *Id.* at 7. Here, the government shows these policy considerations. Likewise, the government showed these considerations for the plaintiff's first two claims in *Nanouk* but failed to do so for Nanouk's third claim. Hence, *Nanouk* does not support the implementation exception. In fact, it supports the majority's opinion.

Fourth, the dissent further contends that deciding to remove a dangerous tree arises at the implementation stage, and the DFE does not protect acts of implementation, only design stage actions. This "implementation exception," sometimes called the undertaking-a-duty exception, is a sticky strand in the tangled web of Ninth Circuit DFE law found in cases the dissent cites like *Kim*, *Whisnant*, and *Bear Medicine*. These opinions are not in harmony with countervailing cases like *Childers*, *Valdez*, *Morales*, *Gonzales*, and *Chadd*, which all involved some element of implementing or failing to implement safety precautions, but in which the courts applied the DFE and dismissed the

plaintiffs' claims. The same applies in *Dalehite*, *Varig Airlines*, and *Gaubert*, which all involve implementation issues.

In addition, the implementation exception contradicts Supreme Court cases and the *Berkovitz/Gaubert* analysis. Under the implementation exception, there can be no policy judgments at the implementation stage. This, in turn, often ends with the unstated premise that once government workers move to the jobsite, nothing they do can involve policy decisions, so everything they do on jobsites lacks DFE protection. This contradicts the plain language in *Dalehite* that the "acts of subordinates in carrying out the operation of government in accordance with official directions cannot be actionable." 346 U.S. at 36. This is a broad and sweeping rule. Consequently, policy "implementing" employees do not lose the DFE defense simply because they are implementing or because they are on the jobsite or because they are dealing with safety issues. There is no time/place exemption for DFE policy decisions.

Furthermore, the dissent cites the Restatement (Second) of Torts §324A (Am. Law Inst. 1965) for the undertaking a service rule. The undertaking a service rule states the same legal proposition as undertaking a duty. The Restatement, however, is not state law unless a state adopts it, and then it is no longer the Restatement. Only state law theories work for FTCA claims, not Restatement theories. And when the theory becomes a state law cause of action, it is subject to the DFE. But there are more problems with the implementation exception.

Importantly, a close reading of the cases that *Kim*, *Whisnant*, and other decisions rely on for the implementation exception shows a misreading of those cases. For example, *Whisnant* cites several decisions for the implementation

exception that close scrutiny shows were decided against the government for other reasons consistent with the *Berkovitz/Gaubert* analysis. For example, in *ARA Leisure Servs. v. United States*, 831 F.2d 193 (9th Cir. 1987), the panel followed the *Berkovitz*/*Gaubert* analysis, not an implementation theory. In *ARA Leisure* a tour bus veered off a dangerous road in the Denali National Park. Plaintiffs alleged negligent design, construction, and maintenance of the road. Construction and maintenance involve "implementation." Plaintiffs specifically claimed that the National Park Service should have put up guard rails to protect travelers. This is a safety issue case like almost all the other cases cited in this opinion.

The panel held that the decision to design and construct the road without guard rails was grounded in social and political policy. *Id.* at 195. Hence, those decisions had DFE immunity. But improperly maintaining the road allowed no immunity because the duty to maintain the road arose from the design contract. It was not a science or technical issue that controlled the court's decision nor the fact that the negligence occurred at the implementation stage. Rather, evidence in the record showed that Park Service standards explicitly required that park roads "conform to the original grade and alignments" and that "graded roads be firm, [and] of uniform cross section." *Id.* In other words, properly maintaining the roads was mandatory according to the contract, so the DFE did not apply.

Next, *Kennewick v. United States*, 880 F.2d 1018 (9th Cir. 1989), is an important Ninth Circuit case that *Whisnant* misconstrued for both the scientific-technical exception and the implementation exception to the DFE. In that case, Plaintiff's damages occurred when an irrigation canal that the United States Bureau of Reclamation ("USBR") had

designed and constructed broke in two places. In *Kennewick*, the panel followed *Berkovitz* and found that the safety and engineering standards were mandatory and specific, so the DFE did not apply to building the canal. *Id.* at 1033.

In *Kennewick*, the safety standards arose out of the construction contract. Although designing the canal involved many technical, economic, and social considerations that had DFE immunity, the construction failures did not. *Id.* at 1029. The contract specified how the USBR should build the canal's embankments. It mandated that the entire surface of the foundation be scarified or plowed to a depth of not less than six inches. *Id*. at 1030. The USBR did not comply with the contract because it did not prepare the foundation, and the canal failed. On plaintiff's negligent construction claim, the DFE did not apply because there was no element of policy judgment in face of a contract requirement. Obviously, *Kennewick* involved scientific and technical questions at the implementation stage—canal building. But the case turned on the government's failure to comply with the contract, and the government's failure to comply with a contract allowed no room for policy judgments. *Id.* at 1026.

Importantly, the court further explained that the DFE does not stop at the planning stage. Indeed, as this court said in *Kennewick*, "[a] matter does not fall outside the discretionary function exception merely because the decision to embark on an activity has already been made. Were that the case, *Dalehite* and *Varig* would be eviscerated." *Id.* at 1024–25. Indeed, one of the most important protections required by the Supreme Court's analysis is eviscerated—the *Gaubert* presumption. The implementation cases treat this presumption as though it does not exist. That matters in Lam's case because the

dissent concedes that the Lake Mendocino policies allow its employees discretion in removing trees.

The *Whisnant* panel also relied on *Marlys Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2001). In *Bear Medicine* the panel said that "[t]he [g]overnment cannot claim that both the decision to take safety measures and the negligent implementation of those measures are protected policy decisions." *Id.* at 1215. But the Supreme Court's ruling in *Varig Airlines* directly contradicts this statement.

In that case a fire started in the towel disposal area below the sink in one of the lavatories on a Boeing 707 that destroyed the airliner and killed 124 people. The Civil Aeronautics Agency ("CAA") had certified that the Boeing 707's design and specifications satisfied minimum safety standards.[1] *Varig Airlines*, 467 U.S. at 800. Plaintiffs' chief claim was that the CAA had negligently inspected the Boeing 707. *Id.* at 801. In other words, at the implementation stage of certifying the aircraft, the CAA failed in undertaking the technical task, an engineering task, of inspecting the aircraft. The CAA had devised and implemented a spot-check plan for such inspections.

About this spot-check plan and its implementation, the Supreme Court explained that the plaintiffs' negligent inspection claim challenged both the decision to implement the plan and applying the plan to a particular aircraft. *Id.* at 819. The court then held that "both components of respondents' claim are barred by the discretionary function

---

[1] The Civil Aeronautics Agency later became the Federal Aviation Administration ("FAA"). The court uses both names in the opinion.

exception to the Act." *Id*. Applying the plan to the plane is classic implementation.

The court further specifically noted that "[i]t follows that the acts of FAA employees in executing the 'spot-check' program in accordance with agency directives are protected by the discretionary function exception as well." *Id*. at 820. Thus, contrary to *Bear Medicine*, the Supreme Court held that both deciding to undertake safety measures and negligently implementing those measures enjoy DFE protection. Indeed, the Supreme Court described the Ninth Circuit's failure in ruling on this case. "The Court of Appeals viewed the inspection of aircraft for compliance with air safety regulations as a function not entailing the sort of policymaking discretion contemplated by the discretionary function exception." *Id.* at 802*.* But the Supreme Court said it did. *Id*. Inspecting is implementing, and the essence of Lam's claim arises out of the alleged failure to properly inspect this tree to identify it as dangerous. This is like the FAA's failure in *Varig Airlines*: the failure to properly inspect the Boeing 707 and identify the hazard.

But there is another problem with *Bear Medicine*. The panel said that "[t]he government cannot claim that both the decision to take safety measures and the negligent implementation of those measures are protected by policy decisions. This argument would essentially allow the government to administratively immunize itself from tort liability under applicable state law as a matter of policy." *Bear Medicine*, 241 F.3d at 1215. The first problem with this idea is obvious. Negligence does not play a role in the DFE analysis. The second problem is also obvious. Congress did intend to immunize FTCA claims for negligence if the negligence arose from policy judgments. Indeed, as the Supreme Court explained in *Dalehite*, the DFE covers all

employees exercising discretion for both negligence and wrongful acts. *Id*. at 967.

Next, on the undertaking-a-duty exception, one further step of analysis helps. The argument for this exception arises, not completely, but significantly from another Supreme Court case—*Indian Towing Co., Inc. v. United States*, 350 U.S. 61 (1955)—and *Whisnant* cites it as authority. *Whisnant v. United States*, 400 F.3d 1177, 1182 (9th Cir. 2005).

*Indian Towing* is a simple case. The U.S. Coast Guard operated a lighthouse on the Mississippi coast. Unfortunately, the light that guided mariners sailing up the coast burned out, the Coast Guard did not replace it, and a tug hauling a cargo of fertilizer crashed into an island and lost the cargo. *Indian Towing*, 350 U.S. at 62–63. The plaintiff filed an FTCA claim against the Coast Guard. In finding against the government, the court explained that once it undertook the duty to operate the lighthouse, it had to exercise due care to keep it working. *Id.* at 126–27.

The problem with using *Indian Towing* to set up this exception to the DFE is that the government did not raise that defense in this case. Because, as the Supreme Court noted in *Varig Airlines*, "[s]ignificantly, the Government conceded that the discretionary function exception was not implicated in *Indian Towing* . . . ." *Id*. at 812. But although the undertaking-a-duty theory may offer a tort theory for an FTCA claim, *Indian Towing* does not say that the DFE does not apply in undertaking-a-duty claim. In fact, as this court stated in *Kennewick*, *Indian Towing* "was devoted to explaining why the government's argument failed; it did not explicate the scope of the discretionary function exception." 880 F.2d 1018, 1023 (9th Cir. 1989). In summary, the implementation exception, as it has developed in many cases

in this Circuit, conflicts with the Supreme Court rulings, even though many other cases in this Circuit follow those rulings.

Finally, on the implementation issue, it is an easy sleight of hand to say that *Berkovitz*, *Kennewick*, *ARA Leisure Services*, and other similar cases were all decided on the design-implementation analysis. For no particular legal reason, it turned out that in these cases the last step in the process when the damage or injury occurred was the implementation stage and that mandatory requirements, like contract requirements, covered the last stage, but not the policy/design stage. In other words, it was a coincidence in most of these cases that spawned and has perpetuated a false understanding of the law grounded in the blanket implementation stage denial of the discretionary function exception.

Courts should not mistake this coincidence as a basis for sidestepping the required Supreme Court analysis by using the design-implementation reasoning. Indeed, if anything is being swallowed in the FTCA cases, the implementation exception swallows the DFE because, as the cases show, most claims arise out of the action that follows a plan. In other words, a jobsite or a national park is where accidents happen and injuries occur. For the most part, plans do not injure people or destroy property; workers do. And workers work as implementors. This is true in every case cited in this opinion. So the question is not did the injury occur at the implementation stage. The question is whether policy discretion applied at the implementation stage, and that is what we have in Lam's case. Now back to *Whisnant* and the dissent's contention that cutting down the tree involved no policy issues, just a technical issue.

The dissent contends that "we should not 'conflate *policy* considerations with *technical* considerations.'" This exception is sometimes called the scientific-professional exception. But *Gaubert*'s presumption does conflate policy considerations with technical considerations when those considerations involve policy discretion. Cutting down a tree involves technical questions, but in Lam's case, the policies authorize discretion, and therefore, the DFE applies.

Moreover, *Whisnant* incorrectly states that "matters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy." 400 F.3d at 1181. Many of the cases cited in this opinion involve scientific or professional issues that the DFE protected. Just to name few: *Varig Airlines* involved an engineering question about safety; *Delhite* involved science and professional questions about the process of turning explosive ammonium nitrate into fertilizer;[2] *Chadd* involved professional questions about how to deal with a deadly mountain goat; and *Morales* involved technical questions about applying the United States Geological Survey standards. And as these cases show, just because an act involves technical or professional questions, does not automatically cut off the DFE.

Finally, in response to the dissent, we turn to the decision in *Whisnant*, which ended with the correct result but for the wrong reasons. Nothing about the facts of that case required the court to apply the implementation analysis or the

---

[2] The plaintiffs in *Delhite* alleged that the government's multiple failures caused an explosion that destroyed two cargo ships, killed many people, and leveled much of the town of Texas City, Texas. 346 U.S. at 22–23.

technical analysis. The court correctly held that "the government's alleged failure to maintain safe and healthy premises was not a decision susceptible to considerations of social, economic or political policy." *Id.* at 1179. Simply stated: There was mold in the commissary, and it needed to come down. There are no policy considerations that justify leaving mold in a store frequented by customers, suppliers, and commissary workers. Mold has no aesthetic value, unlike an interior live oak. There were aesthetic questions and other policy questions about the tree that fell on Lam's tent. The Lake Mendocino policies guided Shull's work and gave him discretion.

HURWITZ, Circuit Judge, dissenting:

The Federal Tort Claims Act ("FTCA") makes the government liable for the torts of its agents "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  But that liability does not extend to

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  The purpose of this "discretionary function exception" is to "prevent judicial 'second-guessing'

of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viaco Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

It is sometimes difficult to determine whether a particular claim falls within the discretionary function exception, and as the majority correctly notes, our case law limning the exception spins something of a tangled web. But this case does not require us to untangle that web. This is a straightforward personal injury case, involving a plaintiff injured by a falling tree while camping on federal property. That tree was inspected, pursuant to agency policy, by a government employee to see whether it posed a danger to campers; he concluded it did not, and the plaintiff alleges that the inspection was negligently performed. This case does not call on us to judge the wisdom of any social, economic, or political policy, but rather simply to perform the familiar role of determining whether the government agent exercised reasonable care.

We have already held that governmental immunity does not apply to precisely such a decision. *Kim v. United States*, 940 F.3d 484, 487–90 (9th Cir. 2019). That is because although the "*design* of a course of governmental action is shielded by the discretionary function exception . . . the *implementation* of that course of action is not." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). Today's decision not only conflicts with our precedent, but also illustrates what Judge Silverman once aptly called the "danger that the discretionary function exception will swallow the FTCA." *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002). Because we should not allow the government to "shortchange" liability for a negligent

undertaking "in the name of policy," *Marlys Bear Med. v. United States ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1216–17 (9th Cir. 2001) (cleaned up), I respectfully dissent.

# I

I do not dispute that the relevant Army Corps of Engineers policies allow government workers to exercise professional judgment in deciding which trees to remove at Lake Mendocino.   But I depart from the majority's conclusion that this is a "policy judgment" covered by the discretionary function exception.

In arriving at a contrary conclusion, the majority gives short shrift to *Kim*, which involved a virtually identical claim.  In *Kim*, we held that a government worker's decision not to remove a tree from Yosemite National Park, pursuant to an agency policy about removal of hazards, did not trigger the discretionary function exception.  940 F.3d at 489–90. We acknowledged that determining whether a tree meets standards for removal surely requires the "careful—perhaps even difficult—application of specialized knowledge."  *Id*. at 489.  We also recognized that in applying that specialized knowledge technicians could exercise some discretion and well hold opposing views, for "technicians, like anyone else, can disagree about their craft."  *Id*.

But, we nonetheless stressed in *Kim* that park workers inspecting trees under the agency's instructions were not making "*policy* choices."  *Id*.  Recognizing the central purpose of the discretionary function exception, we observed that immunity was not necessary to "prevent judicial second-guessing" of a policy scheme.  *Id.* at 487 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).  *Kim* should control our analysis today.  Even assuming the decision not

to remove the tree was based on the considered technical judgment of the inspector, we should not "conflate *policy* considerations with *technical* considerations." *Id*. at 489. Deciding whether a tree is diseased and poses a danger to campers, like deciding when mold should be removed, "involves professional and scientific judgment, not decisions of social, economic, or political policy." *Whisnant*, 400 F.3d at 1183; *see Oberson v. United States Dep't of Agric., Forest Serv.*, 514 F.3d 989, 997 (9th Cir. 2008) (finding exception inapplicable where park rangers failed to place a warning sign along a hazardous snowmobile trail).

## II

The majority distinguishes *Kim* because the tree maintenance policies in that case were more specific than the Corps' policy here. But this is a distinction without a difference. While *designing* Lake Mendocino's tree safety scheme, the Corps might well have balanced the sort of competing objectives—limited budgets, aesthetics, and the busy camping season among them—that concern the majority. Indeed, for present purposes, we can assume that the Corps was not required to have any policy about tree maintenance, leaving campers entirely at the risk of natural hazards. *See Kim*, 940 F.3d at 488 (declining to answer this "hypothetical" question). But, once the government undertook the inspection of trees near the campground, we focus on *implementation*, "the nature of the actions in conducting" the project. *Myers v. United States*, 652 F.3d 1021, 1031–32 (9th Cir. 2011); *see also O'Toole*, 295 F.3d at 1036–37 ("[T]he BIA was under no obligation to acquire Bowler Ranch, but once it did, it also acquired the obligation to keep its irrigation from causing harm to others to the same extent that a private landowner must.").

Having voluntarily undertaken the task of inspecting trees on its property to keep campers on its property safe, the government should not today escape liability for its alleged negligence by casting a camper's injury as the result of a policy decision. The injury was "not the result of a policy choice," but "simply a failure to effectuate policy choices already made." *Nanouk v. United States*, 974 F.3d 941, 950 (9th Cir. 2020) (rejecting application of the discretionary function exception when the government undertook to clean up hazardous chemicals, then failed to discover a "hot spot") (quoting *Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287, 290 (9th Cir. 1989)); *see also Marlys Bear Med.*, 241 F.3d at 1216–17 (holding that "safety measures, once undertaken, cannot be shortchanged in the name of policy"); *see also* Restatement (Third) of Torts § 42 (Am. Law Inst. 2013) ("An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking . . . ."); Restatement (Second) of Torts § 324A (Am. Law Inst. 1965) (same).

The majority's invocation of *Chadd v. United States*, 794 F.3d 1104 (9th Cir. 2015), also fails. In *Chadd*, National Park Service officials knew that wild goats were dangerous and decided to post signs and deter the goats with paintballs, rather than remove or kill them. *Id.* at 1107, 1113–14. We termed that choice of options a policy decision. *Id.* But, we did not thereby suggest that the discretionary function exception would apply if government agents had carelessly placed the signs where no one could see them. That is the kind of alleged negligence the majority immunizes from suit today.

## III

With its narrow focus on whether the policy at issue was sufficiently prescriptive, the majority today incorrectly broadens the government's immunity from tort suit. I respectfully dissent.